# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-1385

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Western |
| | * | District of Arkansas. |
| Thomas Scott Crossland, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: June 11, 2002

Filed: August 15, 2002

_____

Before RILEY, BEAM, and MELLOY, Circuit Judges.

_____

BEAM, Circuit Judge.

Thomas Crossland was convicted by a jury for conspiracy to manufacture methamphetamine and possession of a listed chemical, iodine, with cause to believe it would be used to manufacture methamphetamine. The district court[1] sentenced him to 240 months' imprisonment for the conspiracy conviction and 120 months on the

_____

[1]The Honorable Robert T. Dawson, United States District Judge for the Western District of Arkansas.

possession conviction, to run concurrently. Crossland appeals from the district court's pretrial orders denying a motion to suppress, a renewed motion to suppress and a motion to dismiss. He also appeals his jury conviction, on the basis of insufficient evidence. Finally, he appeals his sentence, arguing that it is excessive. For the reasons set forth below, we affirm.

## I.    BACKGROUND

On October 13, 1998, Crossland ordered 220 pounds of iodine from Patricia Roderstorf, an international sales representative for GFS Chemical. He stated that he was doing business on behalf of Innovative Systems and GSI Incorporated. The credit application he provided to GFS reported that Innovative Systems was in the business of "pyrotechnics/fireworks." On October 23, 1998, he ordered an additional 220 pounds of iodine from Andrew Abdul, president of Dawn Scientific. He requested that the iodine from both companies be delivered to "Kerr-McGee Corporation Sequoyah Fuels Atomic Fuels Division, Fort Smith, Arkansas." Crossland told Roderstorf that the iodine would be used by Kerr-McGee to clean out its radioactive tanks. Roderstorf attempted to locate Kerr-McGee in Fort Smith, but discovered that no Sequoyah Fuels Facility existed in that area. Knowing that iodine was on the DEA "watch list," Roderstorf contacted the DEA and provided agents with information about Crossland's order. Abdul also thought Crossland's order was suspicious, and when he contacted Kerr-McGee's headquarters, he was informed that the company had no properties in Arkansas. Abdul contacted the DEA and provided Agent Kelley with information regarding Crossland's order. Kelley attempted to locate Kerr-McGee Sequoyah Fuels, and discovered that no such business existed. Kelley also checked to see if Crossland had any prior drug offenses and found none.

The iodine from both companies was scheduled to arrive at Overnite Transportation in Muskogee, Oklahoma, on November 5, 1998, and the DEA dispatched a surveillance team to monitor its arrival. On November 5, the iodine

arrived and Crossland retrieved it and drove to a self-storage unit. Agent Kelley and other state and local officers followed Crossland to the storage unit. When they arrived, Crossland was parked in front of his unit and was unloading the iodine. Kelley testified that as he approached the storage unit he could see that inside there was a barrel marked "Red Phosphorous 110 Pounds." Kelley then identified himself, told Crossland he was under investigation and read him his Miranda rights.

Crossland consented to a search of the storage unit. In the unit, the officers found the barrel, which was largely empty, red powder on the floor, a set of scales and a pair of gloves. Oklahoma law prohibited possession of red phosphorous without a permit. Oklahoma authorities seized the items in the storage unit and placed Crossland under arrest for possession of red phosphorous. That charge was eventually dismissed. Crossland also signed a consent to search his residence. When Kelley searched the residence, he found $29,000 in cash, along with documents showing that Crossland had ordered iodine and red phosphorous.

After Crossland was taken to the Muskogee County Jail, an officer advised him of his Miranda rights and asked him about the iodine and red phosphorous. Crossland told the officer that the chemicals were used to turn fireworks red. He also said that the chemicals were used to grow pecan trees. Unable to convince the officer that he was telling the truth, Crossland eventually relented and said, "wait, wait just a minute. I'll tell you the truth about it." The officer waited for Kelley and FBI Agent Caudle to arrive. When Kelley arrived, he again advised Crossland of his Miranda rights. Crossland told Kelley that the chemicals were for Roger Hughes who was using them to make methamphetamine. He said that he made a four hundred dollar profit per 110 pound barrel. Crossland then said, "I pieced it together and figured he was using it or selling it to make crank. It didn't take a rocket scientist to figure out what they were using it for. I sell fireworks but the 1700 pounds of red phosphorous were not used to make fireworks . . . I guess I'm guilty for what I did but I wasn't the one making the dope."

A grand jury indicted Crossland for possession of iodine, a listed chemical, having reasonable cause to believe it would be used to manufacture methamphetamine. Several weeks later, the grand jury returned a superseding indictment adding a second count for conspiracy to manufacture methamphetamine. Crossland filed a motion to suppress his statements and the evidence seized. A magistrate judge conducted a hearing and denied the motion to suppress, which action was adopted by the district court. After Crossland failed to appear at his trial and was apprehended in the Philippines, he filed a renewed motion to suppress based on this court's ruling in United States v. Reinholz, 245 F.3d 765 (8th Cir. 2001). He also filed a motion to dismiss count one, alleging that iodine was not a listed chemical. The district court denied both motions. Crossland appeals all three of the district court's pretrial orders. A trial was conducted and the jury found Crossland guilty on both counts. He appeals the verdict, arguing there was insufficient evidence. The district court sentenced Crossland to 240 months' imprisonment for the conspiracy conviction and 120 months on the possession conviction, to run concurrently. He appeals his sentence, arguing that it is excessive.

## II.    DISCUSSION

### A.    Motions to Suppress

Crossland argues that a suspect's actions in ordering and purchasing iodine, standing alone, do not provide sufficient probable cause to arrest the suspect. Reinholz, 245 F.3d at 778-79. Under Reinholz, he argues that his arrest was unlawful because it was not based on probable cause, and that his statements and the evidence seized from his home should be suppressed. We review a district court's findings of fact for clear error and determinations of reasonable suspicion and probable cause de novo. United States v. Beck, 140 F.3d 1129, 1133 (8th Cir. 1998).

Crossland made a variety of arguments in his initial motion to suppress, including : (1) the barrel inside his storage unit marked red phosphorous was not in plain view; (2) he was forced to give his consent to search the storage unit; (3) he did not know he signed a consent to search his residence; and (4) he was coerced into making incriminating statements at the county jail. In his renewed motion to suppress, Crossland argues that the officers did not have probable cause to arrest him because Reinholz held that ordering and purchasing iodine, standing alone, do not provide sufficient probable cause to make an arrest. After carefully reviewing both his opening and reply briefs, it appears that Crossland only advances his Reinholz argument in this appeal. Out of an abundance of caution, however, we will assume Crossland intended to appeal all of his non-Reinholz arguments as well.

After carefully reviewing the magistrate judge's report and recommendation of the initial motion to suppress, we are persuaded that the barrel of red phosphorous was in plain view, Crossland voluntary consented to the search of his storage unit, he knowingly and voluntarily consented to a search of his residence, and he was not coerced into making the incriminating statements at the county jail. See 8th Cir. R. 47B. We next turn to Crossland's Reinholz argument.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and it requires probable cause for lawful searches and seizures. U.S. Const. amend. IV; see also Illinois v. Gates, 462 U.S. 213, 230, 235 (1983). "We assess probable cause from the viewpoint of a reasonably prudent police officer, acting in the circumstances of the particular case. We remain mindful that probable cause is a practical, factual, and nontechnical concept, dealing with probabilities." Reinholz, 245 F.3d at 776 (internal citations omitted). Furthermore, "[p]robable cause for an arrest exists when the totality of circumstances demonstrates that the arresting officer personally knows or has been reliably informed of sufficient facts to warrant a belief that a crime has

been committed and that the person to be arrested committed it." Id. at 778 (citing Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir. 1999)).

In Reinholz, the court held that the police did not have probable cause to arrest a suspect merely because they had been reliably informed that the suspect had legally purchased iodine, even though a trash search outside the suspect's home revealed drug paraphernalia. Reinholz, 245 F.3d at 776. The court reasoned that the police did not have probable cause because the suspect did not have a drug record, police did not observe him engage in any illegal activity, there was no corroborating police investigation, and surveillance failed to reveal any criminal activity connected to the suspect's house. Id. Although on the surface many of the facts here appear comparable to Reinholz, the cases are, in fact, very different. Reinholz held that the arrest was illegal, in part, because the officers did not advise the suspect of his Miranda rights when they arrested him. Id. Here, on the other hand, Crossland received the Miranda warning the moment Kelley approached him at the storage unit. Furthermore, the officers in this case conducted an independent investigation to corroborate the information supplied by the chemical companies. The officers discovered that Crossland was fabricating the existence of companies and lied about what the chemicals would be used for. In addition, the officers personally observed Crossland load iodine onto a truck and transport it to his storage unit, a different destination than that provided to the chemical suppliers. In Reinholz, on the other hand, all the police had was a tip that the suspect had legally purchased iodine. Also, before the arrest, the officers here obtained consent to search the storage unit and discovered a red phosphorous barrel, scales, gloves, and red powder covering the floor. From the perspective of experienced DEA agents, red phosphorous and iodine are commonly known to be used in the manufacturing of methamphetamine.

In sum, the evidence was suppressed in Reinholz because a non-Mirandized suspect gave statements to officers during a custodial interrogation. The questioning occurred prior to the officers finding any iodine in the possession or control of the

defendant. The police failed to conduct an independent investigation to corroborate the tip that the suspect had in fact purchased iodine. Here, on the other hand, Crossland received the Miranda warning immediately, the officers observed iodine in his possession, and the police investigated the tips from the chemical companies and discovered that Crossland's proffered reasons for purchasing iodine were fabricated. Furthermore, the agents found red phosphorous and scales in the same unit where the iodine was to be stored. Taken together, we think a reasonable officer would conclude that there were sufficient facts to believe that Crossland committed a crime. Therefore, the officers had probable cause and the denials of the motions to suppress were proper.

### B.      Motion to Dismiss

Crossland contends that count two of the indictment is constitutionally insufficient because at the time of his offense iodine was not a listed chemical agent. He argues that at the time of his offense the Attorney General had yet to designate iodine as a list II chemical. We review federal constitutional questions de novo. United States v. Johnson, 56 F.3d 947, 953 (8th Cir. 1995). Crossland's argument is without merit. Although the Attorney General had not yet specified iodine as a list II chemical by regulation at the time of Crossland's indictment, Section 204 of the Comprehensive Methamphetamine Control Act of 1996 specifically designated iodine as a list II chemical. See 21 U.S.C. § 802(35)(I). Thus, iodine was a list II chemical by operation of law and the lack of an additional regulation by the Attorney General is immaterial.

### C.      Sufficiency of the Evidence

Crossland contends that there was insufficient evidence of his involvement with a conspiracy, because at the time he purchased the iodine it was legal to purchase and possess any quantity of iodine. He also points that no

methamphetamine was ever seized in connection with his case. In sum, Crossland argues that there was no evidence that he knew of, or participated in, any conspiracy to manufacture methamphetamine.

"The standard of review of an appeal concerning sufficiency of the evidence is very strict, and the verdict of the jury should not be overturned lightly." United States v. Burks, 934 F.2d 148, 151 (8th Cir. 1991). "In reviewing the sufficiency of the evidence on appeal, the court views the evidence in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict." United States v. Erdman, 953 F.2d 387, 389 (8th Cir. 1992). We will reverse only if no reasonable jury could have found the accused guilty beyond a reasonable doubt. United States v. Harmon, 194 F.3d 890, 892 (8th Cir. 1999).

In order to convict Crossland of conspiracy to manufacture methamphetamine, the government needed to prove that (1) a conspiracy existed; (2) Crossland knew of the conspiracy; and (3) he knowingly became a part of the conspiracy. United States v. Davidson, 195 F.3d 402, 406 (8th Cir. 1999). To establish the existence of a conspiracy the government needed to prove that there was an agreement among individuals to achieve an illegal purpose. United States v. Grego, 724 F.2d 701, 704 (8th Cir. 1984). Circumstantial evidence alone can prove the existence of such agreement. United States v. Townsley, 843 F.2d 1070, 1087 (8th Cir. 1988). An express agreement is unnecessary–a conspiracy may consist of merely a tacit understanding. United States v. Pintar, 630 F.2d 1270, 1275 (8th Cir. 1980). To find that an accused participated in a conspiracy, the government must show some element of cooperation beyond mere knowledge of the existence of the conspiracy. United States v. Duckworth, 945 F.2d 1052, 1053 (8th Cir. 1991).

Viewing the evidence in a light most favorable to the government, we think a reasonable jury could find that Crossland was guilty of both counts in the superseding

indictment. A forensic chemist testified that red phosphorous, iodine and ephedrine can be combined with other items available from grocery stores to make methamphetamine. The record shows that in addition to the iodine shipment, Crossland ordered and received a total of 1,964 pounds of red phosphorous from one distributor alone. He also attempted to order 14,000 pounds of red phosphorous before the prospective distributor was contacted by the police. He told these distributors that he wanted the red phosphorous to make fireworks and road flares. While Crossland claimed at various times that the chemicals he possessed would be used to grow pecan trees, put color in fireworks, and make road flares, the jury heard evidence that red phosphorous had no application for growing pecan trees and that iodine was toxic and would kill the trees. Evidence was also presented that iodine is not used to manufacture fireworks. Furthermore, an expert in pyrotechnics testified that Crossland could have made 35 million road flares with the amount of red phosphorous he purchased. The jury heard other testimony debunking Crossland's proffered explanations for the chemicals. For instance, Kerr-McGee did not have a Sequoyah Fuels facility. In fact, Kerr-McGee did not own any property in Arkansas. Also, there was testimony that iodine is not used to decontaminate nuclear facilities. In sum, it is reasonable to assume that the jury rejected all of Crossland's explanations for legitimate uses of the chemicals, thus supporting the inference that Crossland knew exactly what the chemicals were in fact used to produce.

Crossland's own statements essentially concede that he was involved in a conspiracy to manufacture methamphetamine. He said he assumed Roger Hughes was making "crank" with the chemicals he was providing. He said it "didn't take a rocket scientist" to figure it out. Agent Kelley subsequently found Roger Hughes in an Oklahoma jail charged with methamphetamine violations. Crossland also acknowledged that he knew he should not be supplying methamphetamine producers with precursor chemicals when he said "I guess I'm guilty for what I did, but I wasn't the one making the dope." Crossland even acknowledged that he knew the location of one of the methamphetamine labs where his chemicals went when he told Kelley,

"Jimmy said that the dope lab was in Broken Arrow, Oklahoma." In addition, the jury heard from Crossland's cellmate, who testified that Crossland told him that he had previously made methamphetamine but could make more money by selling the chemicals to other people who made the drug. It is clear from reviewing the record that a reasonable jury could conclude that Crossland was a supplier and broker of chemicals used to make methamphetamine and that he was guilty of conspiracy and possession of iodine having reasonable cause to believe it would be used to manufacture methamphetamine. See, e.g., United States v. Montanye, 962 F.2d 1332, 1343 (8th Cir. 1992) (subsequent history omitted)[2] (supplier who sold laboratory glassware, knowing with certainty that it would be used in illegal drug manufacturing conspiracy, was not entitled to favorable aiding and abetting instruction).

### D.    Sentencing Issue

Finally, Crossland claims that his sentence was grossly disproportionate to his crime, and that it constituted cruel and unusual punishment in violation of the Eighth Amendment. We review a district court's finding of fact at sentencing for clear error. United States v. Russell, 234 F.3d 404, 408 (8th Cir. 2000).

The district court determined that the sentencing guidelines did not apply to Crossland on the conspiracy and iodine possession charges because there were no guidelines in existence for those at the time of his offense. As a result, the district court turned to the conspiracy statute's sentencing range and found that the statutory maximum sentence for drug conspiracy was twenty years. 21 U.S.C. § 841(a)(1). The statutory maximum for possession of iodine with cause to believe it would be

---

[2]This opinion was subsequently vacated and a suggestion for rehearing en banc was granted. 962 F.2d at 1349. However, the en banc court specifically approved of the portion of the prior panel opinion containing the discussion of the aiding and abetting instruction. See United States v. Montanye, 996 F.2d 190, 194 (8th Cir. 1993) (en banc).

used to manufacture methamphetamine was ten years. 21 U.S.C. § 841(d)(2). The district court sentenced Crossland to the statutory maximum on both counts, but elected to have the sentences run concurrently. The district court based its sentence, in part, on the testimony of a chemist who reported that approximately 146 pounds of eighty percent pure methamphetamine could have been manufactured from the 440 pounds of iodine purchased by Crossland. The district court concluded that, in order to reflect the seriousness of the offense, the defendant should be sentenced to the statutory maximum.[3]

Crossland advances the unremarkable argument that there were no drugs manufactured from the iodine the police actually seized. While obvious, that fact is totally irrelevant. The fact that the police prevented the distribution of the iodine to methamphetamine manufacturers does not diminish Crossland's culpability for his offenses. In sum, the district court did not err in sentencing Crossland to the statutory maximum.

## III.   CONCLUSION

For the reasons discussed, we affirm the pretrial orders of the district court, the jury verdict and the sentence.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[3]If the sentencing guidelines that are now in effect had governed Crossland's sentence, it appears his guideline range would have been between 324 and 405 months' imprisonment.