# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 02-1966

———————

United States of America,

                Plaintiff-Appellee,

    v.

Jose Espino,

                Defendant-Appellant.

\*
\*
\*
\*
\*   Appeal from the United States
\*   District Court for the District
\*   of Nebraska.
\*
\*
\*

———————

Submitted: October 8, 2002

Filed: January 9, 2003

———————

Before JOHN R. GIBSON, MURPHY, and SMITH, Circuit Judges.

———————

SMITH, Circuit Judge.

Jose Espino appeals his conviction of conspiracy to distribute and possess with intent to distribute more than 500 grams of methamphetamine.[1] Espino challenges the sufficiency of the evidence used to convict him. He also contends that the District

---

[1] 21 U.S.C. § 846 (conspiracy to distribute methamphetamine) and 21 U.S.C. §841 (a)(1) and (b)(1) (possession with intent to deliver methamphetamine of 500 grams or more).

Court[2] erred in allowing his wife to testify against him in violation of the spousal privilege and in allowing lay witnesses to testify about the weight and amount of the drugs distributed by Espino. We affirm.

## I.

Espino's April 27, 2001, arrest stemmed from his alleged participation in the sale and distribution of methamphetamine for approximately four years beginning in July 1997. The government built its case against Espino upon the testimony of six witnesses, including Espino's wife, Brandy Goatley, who testified in exchange for the possibility of reduced sentences in their own drug prosecutions. These witnesses testified that they either bought from or were delivered methamphetamine by Espino or Goatley during the four years of their distribution operation. Following trial, a jury convicted Espino of the charge and found that the amount of methamphetamine involved was 500 grams or more. The District Court sentenced Espino to 235 months' imprisonment on March 15, 2002.

## II.

### *Sufficiency of the Evidence*

First, we address whether sufficient evidence exists to support the jury's verdict. "The standard of review of an appeal concerning sufficiency of the evidence is very strict, and the verdict of the jury should not be overturned lightly." *United States v. Crossland,* 301 F.3d 907, 913 (8th Cir. 2002) (quoting *United States v. Burks,* 934 F.2d 148, 151 (8th Cir.1991)). In reviewing the sufficiency of the evidence on appeal, the court views the evidence in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict. *United States v. Erdman,* 953 F.2d 387, 389 (8th Cir.1992). We will reverse only if

---

[2] The Honorable Richard G. Kopf, United States District Court Judge for the District of Nebraska.

no reasonable jury could have found the accused guilty beyond a reasonable doubt. *United States v. Harmon,* 194 F.3d 890, 892 (8th Cir.1999).

Espino concedes that the evidence proves that he independently sold and distributed methamphetamine. However, he argues that none of the admissible testimony[3] proves that he conspired with anyone to commit this crime. Furthermore, he argues that these witnesses were biased in that they each received a substantial benefit from the government to testify that there was a conspiracy.

To establish that a defendant conspired to distribute drugs under 21 U.S.C. § 846, the government must prove: (1) that there was a conspiracy, i.e., an agreement to distribute the drugs; (2) that the defendant knew of the conspiracy; and (3) that the defendant intentionally joined the conspiracy. *United States v. Jones*, 101 F.3d 1263, 1267 (8th Cir. 1996); *United States v. Westbrook*, 896 F.2d 330, 338 (8th Cir. 1998). Tacit understanding – as opposed to mere presence at and knowledge of an intended drug sale – will suffice; a formal agreement is unnecessary. *Id.* (citing *United States v. Shoffner*, 71 F.3d 1429, 1433-34 (8th Cir. 1995)). The existence of a conspiracy may be proved by either direct or circumstantial evidence. *United States v. Jenkins*, 78 F.3d 1283, 1287 (8th Cir. 1996). Evidence of association or acquaintance, though relevant, is not enough by itself to establish a conspiracy. *United States v. Ivey*, 915 F.2d 380, 384 (8th Cir. 1990).

The evidence in this case supports the jury's finding of Espino's involvement in a conspiracy to distribute methamphetamine. With the exception of Goatley, the government's witnesses testified that they either bought or were distributed methamphetamine from Goatley or Espino from the couple's home during the years

---

[3] In his second argument here, Espino asserts that Goatley's testimony was inadmissible under Nebraska's and the Federal Rules of Evidence's spousal privilege. This issue is addressed below.

of the couple's drug operation.[4] Melanie Berlie testified that she had been purchasing methamphetamine from Goatley since 1996, and that she first met Espino at Goatley's home in 1998. Berlie testified that Goatley told her that it would be possible to buy drugs from Espino, and that "[i]t was just one or the other, whoever was there or whichever one was doing it." Berlie purchased methamphetamine three or four times a week from the couple at their residence. She purchased the drugs half the time from Goatley and half the time from Espino. Berlie further stated that if Goatley or Espino did not have the drugs when she wanted them, "[o]ne of them would pick it up and one of them would bring it to me."

Penelope Woodward testified that she met Espino at a bar in Grand Island, Nebraska. In the year thereafter, she bought methamphetamine from Espino at the bar, her home, or Espino's and Goatley's home. She testified that Espino would come by her home as often as every other day to sell or distribute methamphetamine to her.

Joe Olivo, a twenty-year methamphetamine user, testified that he first bought drugs from Espino in the winter of 1998. Olivo said he bought methamphetamine from Espino four or five times, and that he resold some of it.

Cassandra Brunick ("Cassandra") testified that she first bought drugs from Goatley in late 1997 and met Espino through Goatley in 1998. Cassandra began buying methamphetamine from Espino in April 1998, and continued through February 1999. She purchased methamphetamine from Espino through Goatley once or twice a week. Cassandra testified that she would go alone or with her husband, Steve Brunick ("Steve"), to purchase the drug from Espino at a trailer where Espino and Goatley lived, and later at a house on Charles Street where Espino, Goatley, and

---

[4] Espino and Goatley met in 1997, began living together in 1998, and married in either April or May of 1999.

others were living. Although she initially purchased methamphetamine mostly from Goatley, she later purchased up to half from Espino.

Steven Brunick testified that he and his wife first met Espino through Goatley during the summer of 1998. Steve made his first purchase from the couple in November 1998 at Espino's and Goatley's trailer, and continued to buy methamphetamine one or two times a week from Espino and Goatley until the end of January 1999. Steve testified that he would resell the narcotic. Steve derived his entire financial support from this enterprise during the period from February 1998 to January 1999.

Lastly, Goatley testified that she and Espino first lived together in a trailer on Sylvan Street, then at a trailer at Mobile Manor. Later, they lived in a house on Charles Street with Michelle and Joe Olivo. Goatley testified that she had been selling and using methamphetamine for nine years, and that she sold methamphetamine from the residence at Mobile Manor. While living at Mobile Manor, Goatley saw a person named "Chappo" give Espino methamphetamine on two occasions. During one of these exchanges, Goatley overheard Chappo and Espino arguing over methamphetamine "because Chappo had an ounce in the house and had said that Jose had stole it or something."

Goatley also testified that while living at the Charles Street residence, she knew Espino was obtaining methamphetamine from a person named "Genaro." Genaro would take methamphetamine to the couple's house in one-quarter-pound amounts once a week during a one- to two-month period between Christmas of 1998 and March or April of 1999. Goatley testified that she and Espino sold the drugs to Berlie and the Brunicks, and that she was aware that Espino's customers would page him to order drugs and he would leave their residence at Mobile Manor to acquire the drugs. Finally, Goatley testified about a drug deal that occurred in mid-1999. She bought a

quarter-pound of methamphetamine from Jaime Torres in June and gave it to Espino. On June 3, 1999, Goatley was arrested during a police drug operation.

Even if Goatley should be excluded as a witness, as Espino contends, the remaining witnesses' testimony provide more than substantial evidence in support of the jury's verdict. Each one testified that Espino and Goatley cooperatively operated their drug enterprise out of their home, and that they could be contacted for the purchase and delivery of methamphetamine separately or together. A purchase from either Espino or Goatley could result in a delivery from the other. These facts indicate an agreement between the two to maintain an ongoing enterprise. Furthermore, Steve Brunick and Olivo testified that they resold much of the methamphetamine bought from Espino, thus extending the conspiracy to distribute and possess with intent to distribute methamphetamine.

With Goatley's testimony, the conspiracy evidence becomes overwhelming. Her testimony provides additional direct proof that she and Espino jointly bought and sold methamphetamine from their household. Goatley testified that she introduced Espino to several of the customers who had previously bought only from Goatley. The jury could reasonably conclude, based upon her testimony, that Espino conspired with Goatley, other witnesses, and the drug suppliers to sell methamphetamine.

The evidence is similarly cogent with respect to the drug quantities involved in the transactions. Based upon the proof submitted, Espino's drug sales supplied amounts far in excess of the charged 500 grams, including over 1,200 grams to Berlie, 616 grams to Woodward, 1,232 grams to Cassandra Brunick, and 896 grams to Steve Brunick. Several witnesses testified that they not only bought methamphetamine from Espino but also resold it. We hold that sufficient evidence supports the jury's verdict.

We also note that Espino challenges the credibility of the witnesses. He argues that the veracity of these witnesses should be questioned because they potentially

received the substantial benefit of a reduced sentence in exchange for testifying as to the existence of a conspiracy. This allegation is without merit. In reaching its verdict, the jury exercised its prerogative to credit the testimony of the government's witnesses or discount it. That one or more of these witnesses were members of the scheme does not undermine the verdict. *United States v. Slaughter*, 128 F.3d 623, 628 (8th Cir. 1997)*; United States v. Witschner*, 624 F.2d 840, 843 (8th Cir. 1980); *see also United States v. Cunningham*, 83 F.3d 218, 222 (8th Cir.1996). Certainly, whether a witness has a plea agreement with the government, and whether a witness will receive a sentence reduction in exchange for his testimony, is relevant in assessing the witness's credibility. *United States v. Roan Eagle*, 867 F.2d 436, 443-44 (8th Cir.1989). The jury, however, is always the ultimate arbiter of a witness's credibility, and this Court will not disturb the jury's findings in this regard. *Witschner,* 624 F.2d at 843.

## III.

### *Spousal Privilege*

Espino next argues that the District Court erred in allowing Goatley to testify because Espino did not consent to her testimony. Specifically, Espino cites Nebraska's spousal-privilege statute, Neb. Rev. Stat. § 27-505(2)[5], and Federal Rule of Evidence 501[6]. He argues that this statute, which precludes testimony by a spouse

---

[5] Neb. Rev. Stat. § 27-505(2) provides: "During the existence of a marriage, a husband and wife can in no criminal case be a witness against the other. This privilege may be waived only with the consent of both spouses."

[6] Federal Rule of Evidence 501provides:

Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be

when the privilege is claimed by the defendant, when read in concert with Rule 501, should exclude Goatley's testimony. We review admission of testimony under an abuse of discretion standard. *United States v. Bad Wound*, 203 F.3d 1072, 1076 (8th Cir. 2000).

Espino claims that federal courts must look to the forum state's law on privilege to decide when a spouse may testify. For authority, Espino cites *Serra v. Michigan Department of Corrections*, 4 F.3d 1348 (6th Cir. 1993). Espino's reliance on *Serra* to support his claim is misplaced.[7] The court in *Serra* merely applied state law in the context of a habeas corpus review of a state court criminal conviction.

Neither does Rule 501 mandate the approach Espino suggests. The plain language of the rule states that issues of privilege "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in

interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

[7] In *Serra*, the Sixth Circuit Court of Appeals discussed, in part, whether the habeas petitioner's Sixth Amendment right to assistance of counsel was violated where the petitioner's prior counsel initially represented the petitioner and his wife prior to the criminal trial. In the discussion, the court of appeals noted that the district court referenced the Michigan statute placing the right to prevent a spouse's testimony in the hands of the defendant. The defendant in *Serra* was tried in Michigan state court which followed state law, and it was only the habeas corpus petition that was addressed in federal court. The federal district court and court of appeals did not adopt the approach asserted by Espino here; rather, those courts merely recognized, without commenting further, that the Michigan statute in *Serra* would have required the defendant in his *state-court* criminal trial to give his consent before his spouse testified.

the light and reason of experience." Furthermore, the rule specifically provides that "in civil actions and proceedings, with respect to an element of a claim or defense," the privilege issue "shall be determined in accordance with State law." Put simply, federal courts follow the federal common law regarding privileges in federal criminal proceedings. The Supreme Court in *Trammel v. United States*, 445 U.S. 40, 47 (1980), noted that Congress, in rejecting a specific set of rules for various privileges and enacting Rule 501, "manifested an affirmative intention not to freeze the law of privilege." The Court further noted that Congress's purpose was to allow the federal courts to develop rules on a case-by-case basis and "to leave the door open to change." *Id*. Therefore, federal courts are not bound by a mechanistic approach for applying the privilege in criminal cases.

Espino's privilege claim has no merit under federal common law. Federal courts recognize two distinct marital privileges: the marital confidential communications privilege and the adverse spousal testimony privilege. *Bad Wound*, 203 F.3d at 1075. Neither form of the privilege can be properly invoked in this case. Under the marital confidential communications privilege, it is well settled that the communications to which the privilege applies have been limited to utterances or expressions intended by one spouse to convey a message to another. *United States v. Smith*, 533 F.2d 1077, 1079 (8th Cir. 1976). Though this privilege has been expanded to encompass more than mere conversations and writings, invocation of the privilege requires the presence of at least a gesture that is communicative or intended by one spouse to convey a message to the other. *Id.* Espino cites no such facts.

The District Court's order on Espino's motion in limine precluded the government from introducing evidence of any conversations between Espino and Goatley during the course of the marriage except for conversations that took place in the presence of third parties. The District Court denied the remainder of the motion in limine, ruling that the government could introduce evidence through Goatley's testimony adverse to Espino if it involved Espino's conduct rather than his

communications. Clearly, the District Court properly preserved the marital confidential communications privilege by prohibiting Goatley from testifying about personal conversations and communications between the couple outside the presence of third parties, and by ruling that Goatley could testify as to Espino's conduct so long as it did not involve a communicative gesture. Here, Espino points to no evidence regarding a communicative gesture about which Goatley testified; rather, Goatley's testimony focused on her observations of Espino's conduct and actions involving his drug trade before and during the course of their marriage. As such, the District Court did not err in admitting Goatley's testimony under the marital confidential communications privilege.

Under the adverse spousal testimony privilege, an individual "may be neither compelled to testify nor foreclosed from testifying" against the person to whom he or she is married at the time of trial. *Bad Wound*, 203 F.3d at 1075 (citing *Trammel*, 445 U.S. at 53). The privilege, therefore, rests with the testifying spouse who may waive the privilege without consent of the defendant spouse. *Id.* In *Trammel*, the Court traced the history of this spousal privilege. The Court concluded that the rule as it previously existed (allowing only the defendant spouse to give consent for the witness spouse to testify) would be modified to allow the witness-spouse alone to have the privilege to refuse to testify adversely against his or her spouse. The Court concluded that this modification promoted the public's interest in marital harmony without unduly burdening legitimate law-enforcement needs. *Trammel*, 445 U.S. at 53. Furthermore, the Court noted that a witness-spouse's agreement to testify after a grant of immunity and assurances of lenient treatment does not render his or her testimony involuntary. *Id.* Therefore, Goatley's testimony viewed through the lens of this privilege was not improper pursuant to the Court's decision in *Trammel*, and the District Court did not abuse its discretion in admitting the testimony.

-10-

IV.

*Drug Weight*

Finally, Espino argues that the District Court erred in admitting testimony of lay witnesses concerning the weights and quantities of methamphetamine sold by Espino because the witnesses' testimony lacked adequate foundation.[8] Espino contends that while some of the drugs were actually weighed, the witnesses also testified to amounts and weights of drugs that the witnesses only observed but did not weigh themselves. As such, we must determine whether a lay witness having extensive experience in the drug trade with this particular drug possesses the requisite knowledge to testify accurately about the weight of the drugs without having actually weighed each purchase. Admission of testimony is reviewed under an abuse of discretion standard. *Bad Wound*, 203 F.3d at 1076.

Federal Rule of Evidence 602 requires that a witness have personal knowledge of the matters about which he or she testifies, except in the case of expert opinions.[9] Federal Rule of Evidence 701 allows lay opinion that "is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."[10] Rule 701 permits such testimony if it is based on "relevant historical

---

[8] We note that Espino challenges only the weight of the methamphetamine, not its identification.

[9] Federal Rule of Evidence 602 "Lack of Personal Knowledge" provides in pertinent part:

> A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony.

[10] Federal Rule of Evidence 701 provides:

or narrative facts that the witness has perceived," *Teen-Ed, Inc. v. Kimball Intern., Inc.,* 620 F.2d 399, 403 (3rd Cir.1980), and if it "would help the factfinder determine a matter in issue," *Hurst v. United States,* 882 F.2d 306, 312 (8th Cir.1989). "While the ordinary rule confines the testimony of a lay witness to concrete facts within his knowledge or observation, the [c]ourt may rightly exercise a certain amount of latitude in permitting a witness to state his conclusions based upon common knowledge or experience." *United States v. Oliver,* 908 F.2d 260, 264 (8th Cir. 1990) (citing *Batsell v. United States,* 217 F.2d 257, 262 (8th Cir.1954)). Lay opinion testimony is admissible only to help the jury or the court to understand the facts about which the witness is testifying and not to provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events. *See United States v. Peoples*, 250 F.3d 630, 641 (8th Cir. 2001)*; United States v. Cortez,* 935 F.2d 135, 139-40 (8th Cir.1991); *United States v. Figueroa-Lopez,* 125 F.3d 1241, 1244-45 (9th Cir.1997).

The general application of Rule 701 indicates that a lay witness may testify about facts within his or her range of generalized knowledge, experience, and perception. Here, these witnesses, particularly Goatley, testified that they either actually weighed the quantities of methamphetamine purchased from Espino, or through their experience knew that the volume sold generally constituted a certain weight of the drug. These lay witnesses testified based upon their experience. They were not attempting to explain any technical or specialized information, and several of them had actually used a scale to weigh the methamphetamine.

---

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

The record contains ample evidence of the lay witnesses's experience in the drug trade and with assessing quantities of drugs. For example, Berlie testified that she usually bought drugs in quantities of an ounce at a time and that the drugs she received from Espino were weighed on a scale. Woodward said she first bought "eight balls," or an eighth of an ounce of the drug from Espino, but then later bought amounts from a quarter of an ounce to one ounce. Woodward, who used and sold drugs for three to four years, testified that she used a scale to weigh the amounts that she bought and resold. During cross examination, Woodward described the scale as a digital scale similar to that used by Espino for weighing drugs. Olivo, a twenty-year methamphetamine user, testified that each of his purchases from Espino was for one ounce, and the amounts were weighed on a scale by Olivo's wife. Cassandra Brunick testified that Espino weighed the methamphetamine that she bought from him, and each purchase was one to two ounces. Steven Brunick testified that the first time he purchased from Espino, Espino weighed and sold him one-half of an ounce of methamphetamine. Steven bought methamphetamine from Espino at other times in amounts from four to six ounces for resale. Goatley, who used and sold methamphetamine for nine years, testified that she would normally weigh the methamphetamine, but from experience also was able to determine approximate weight by visual examination. While living at Mobile Manor, Goatley saw Espino receive methamphetamine from a person named "Chappo" on two occasions. On each of these occasions, Goatley saw Chappo provide Espino with two ounces. Finally, the government noted that over the course of his dealings, Espino supplied far in excess of 500 grams to the various witnesses who testified, including over 1,200 grams to Berlie, 616 grams to Woodward, 1,232 grams to Cassandra Brunick, and 896 grams to Steven Brunick.

Espino cites *United States v. Mehaffey*, 53 F.3d 128 (6th Cir. 1995), for the proposition that the government failed to establish beyond a reasonable doubt through any credible evidence the amount of methamphetamine sold by Espino. However, *Mehaffey's* facts are easily distinguished. In *Mehaffey*, the District Court attributed

-13-

900 grams of drugs to the defendant; however, in reaching this conclusion, the District Court relied on conversion calculations detailed in a different case rather than evidence presented in Mehaffey's case to determine the volume and weight of the distilled illegal substance. The Sixth Circuit Court of Appeals determined that reliance on these calculations from prior case law was improper and, thus, the prosecution failed to meet its burden of proof as to the amount of the illegal drug distilled from the precursor drug. Clearly, *Mehaffey* does not apply. In this case, the jury heard specific testimony from witnesses, who all had substantial experience in the use and trade of illegal drugs, regarding the weight of the methamphetamine Espino sold. Therefore, the District Court did not abuse its discretion in admitting this testimony.

## V.

### *Judicial Notice Motion*

As a final matter, separate from his appellate brief, Espino has filed a pro se "Motion to Take Judicial Notice," outlining twenty-six "judicially noticeable facts," requesting that this court appoint different appellate counsel and suspend the appeal until new counsel can prepare additional appeal materials. Espino asserts that his appellate counsel, who was also Espino's second appointed trial counsel, was ineffective at trial in a number of ways. For example, Espino claims that trial counsel failed to properly assess and present various defenses at trial, failed to properly advise Espino about the possible sentencing range if convicted, erred in notifying the prosecution of a problem with the original indictment resulting in the filing of an amended indictment that increased the punishment range, and failed to update Espino about trial strategy and various filings prior to trial. Espino claims that had his trial attorney provided correct advice prior to trial, he would have pleaded guilty to the original indictment and would have received a "less severe" sentence. Espino now requests that this court take judicial notice of these "judicially noticeable facts" and suspend the appeal process until a new appellate attorney can be appointed to raise these issues of claimed ineffective assistance of counsel in the direct appeal.

A criminal defendant does not have the absolute right to counsel of his own choosing. *Carey v. State of Minnesota*, 767 F.2d 440, 441 8th Cir. 1985)*; Williams v. Nix*, 751 F.2d 956, 959 (8th Cir.1985). Furthermore, an indigent defendant has no right to demand of a court that a particular attorney, or particular attorneys, be appointed to represent him. *Id.* Instead, "[s]ubstitution of counsel is a matter committed to the sound discretion of the trial court." *Meyer v. Sargent,* 854 F.2d 1110, 1114-1114 (8th Cir. 1988) (quoting *Nerison v. Solem*, 715 F.2d 415, 418 (8th Cir.1983), cert. denied, 464 U.S. 1072 (1984) and 465 U.S. 1026 (1984)).

After the District Court entered judgment, Espino filed a pro se notice of appeal. He then requested that the District Court appoint appellate counsel to handle this appeal. The District Court directed the request to this court, and on April 17, 2002, we appointed Attorney Loenard P. Vyhnalek, Espino's trial counsel, to continue Espino's case on appeal. Given this history, we deny Espino's request to stay the proceedings and appoint new appellate counsel. The proper method to challenge the effectiveness of counsel at trial and on appeal is in a petition for writ of habeas corpus.

Affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.