# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-1745

_____

United States of America,                    *
                                             *
             Appellee,                        *
                                             *
      v.                                      *
                                             *
Reginald Dinez Johnson, also known           *
as Cedric Miller,                            *
                                             *
             Appellant.                       *


_____

No. 05-2056
                                             Appeals from the United States
_____                                  District Court for the
                                             Eastern District of Missouri.

United States of America,                    *
                                             *
             Appellee,                        *
                                             *
      v.                                      *
                                             *
Patricia Alexander-Butler, also known        *
as Patricia Washington,                      *
                                             *
             Appellant.                       *

_____

No. 05-2092
_____

| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Carl Alexander, | * |
| | * |
| Appellant. | * |

_____

No. 05-2975
_____

| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Terry Brown, | * |
| | * |
| Appellant. | * |

_____

Submitted:  February 13, 2006
Filed:  June 15, 2006
_____

Before WOLLMAN, FAGG, and ARNOLD, Circuit Judges.
_____

WOLLMAN, Circuit Judge.

This appeal follows the convictions of Reginald Dinez Johnson, Patricia Alexander-Butler, Carl Alexander, and Terry Brown. Johnson, Alexander, and Brown were convicted of conspiracy to possess with intent to distribute cocaine and phencyclidine (PCP) in violation of 21 U.S.C. §§ 841(a)(1) and 846. Alexander and Alexander-Butler were convicted of conspiracy to commit wire fraud in violation of 18 U.S.C. § 371. Alexander was also convicted of engaging in monetary transactions in property derived from unlawful activity in violation of 18 U.S.C. § 1957(a).

The appellants raise overlapping issues. Johnson argues that the district court[1] erred in admitting certain physical evidence and testimony. Alexander and Brown argue that the evidence is insufficient to support their drug conspiracy convictions, that a new trial is warranted based on newly discovered evidence, and that their sentences violate their constitutional rights under the Sixth and Eighth Amendments. Alexander-Butler and Alexander argue that the evidence is insufficient to support their convictions. We affirm.

## I. DRUG CONSPIRACY

We state the facts in the light most favorable to the jury verdict. United States v. Selwyn, 398 F.3d 1064, 1065 (8th Cir. 2005). In the 1990s, Edward Quentin Anderson sold drugs in the St. Louis area. Around 1996, Anderson began buying cocaine from Lester Diggs. When a cocaine drought hit St. Louis and prices skyrocketed, Anderson and Diggs decided to buy drugs directly from suppliers in California. At first, they bought marijuana and later, cocaine and PCP.

---

[1]The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri.

In the beginning of this cross-country relationship, Diggs and Anderson tried different methods of transporting the drugs from California to St. Louis. Eventually, they purchased a truck with two gas tanks, one of which was outfitted with a false tank. Diggs and Anderson hired a white driver and followed him in a second vehicle. This chase vehicle served two purposes: it accompanied the vehicle that contained money on the way to California and drugs on the return trip to St. Louis, and it served as a decoy for law enforcement. Anderson testified that he did not trust the couriers with the large quantities of drugs or sums of money and that it was more likely that the police would stop the three or four black men in the chase vehicle than the white driver.

Over the course of the next seven or eight years, Anderson purchased several different vehicles with false tanks or hidden compartments and hired various white men to transport the drugs. Anderson, Brown, Diggs, Johnson, and others drove the chase vehicle, usually a van with tinted windows. Anderson testified that the group made numerous trips to California and a few trips to Texas to purchase drugs and transport them back to St. Louis.

On at least two occasions, Alexander traveled with his codefendants to purchase drugs. In 1996 or 1997, Alexander, Anderson, and Erica Bass flew to Los Angeles to purchase cocaine. Although most of the purchase money was concealed in the transport truck's false tank, Alexander carried $10,000 on the plane. After arriving in California, the group purchased cocaine. Alexander purchased half of a kilogram using his $10,000. A hired driver transported the cocaine, including Alexander's portion, to St. Louis. On another trip, Anderson, Johnson, Alexander, Diggs, and a few others flew to Houston to buy cocaine. Although the group was unable to purchase the drugs from the intended source, Alexander found a different source and purchased half of a kilogram of cocaine. He returned to their shared hotel room, packaged the cocaine, and returned to St. Louis on a commercial flight, carrying the drugs with him.

-4-

The conspiracy experienced general success until a Kansas deputy sheriff stopped Jason Miller, a drug courier, for speeding. Miller gave consent to search the vehicle, and the deputy found six kilograms of cocaine. Miller advised the deputy that he was en route to deliver the drugs. The deputy then contacted the FBI, which arranged a controlled delivery of the cocaine to take place in a parking lot at the DePaul Health Center in St. Louis. On December 11, 2001, Anderson, Johnson, and two other men were arrested at the scene and taken to the Jennings Municipal Jail. At the time of the arrest, Johnson identified himself as Cedric Miller.

Johnson was searched either at the scene or at the Jennings Municipal Jail, and the items found on his person were placed in a plastic bag. FBI Agent Henry Vera testified that the bag contained the following items: an Illinois identification card bearing a picture of Johnson and the name of Cedric Miller, a cellular telephone, a pager, and loose slips of paper containing incriminating information. The FBI transferred the bag containing Johnson's personal property to the Jennings Police Department. After booking Johnson, the police returned the bag to the FBI. Agent Vera testified that he participated in the investigation of Johnson's personal property on December 11 or 12, 2001, and that the accompanying report was transcribed on December 16, 2001.

Following the arrests at the hospital, the group did not sell cocaine for several months. Because they experienced several financial losses, the group decided to sell PCP, which could be purchased at a price less than cocaine and sold for a similar profit. They bought the drugs in California and used the same method of transporting PCP as they had cocaine.

In February 2004, a Kansas trooper stopped one of their PCP couriers and found $28,000 in a secret compartment. The driver told the trooper that three men, including Diggs, were following him in the chase vehicle. When the chase vehicle

was stopped and its occupants arrested, Diggs provided an Illinois identification card in the name of Stephen Boyd.

On August 19, 2004, Johnson, Alexander, Brown, Anderson, Diggs, Bass, and ten others were charged in a superseding indictment for their role in the drug conspiracy. Only Johnson, Alexander, and Brown proceeded to trial on Count I, conspiracy to possess with intent to distribute cocaine and PCP.

## A. Reginald Dinez Johnson

At trial, the government offered into evidence the identification card in the name of Cedric Miller, the loose pieces of paper, the cellular phone, and the pager. The district court admitted these items as having been lawfully obtained during a search and inventory incident to a lawful arrest. Johnson does not contest the lawfulness of his arrest, but argues that the warrantless search of his personal property violated his Fourth Amendment rights. We disagree.

We review the denial of a motion to suppress *de novo*. United States v. Adams, 401 F.3d 886, 893 (8th Cir. 2005). "'[We] review the underlying factual determinations for clear error, giving due weight to the inferences of the district court and law enforcement officials.'" Id. (quoting United States v. Coleman, 349 F.3d 1077, 1083 (8th Cir. 2003)).

Had the FBI retained Johnson's personal property throughout its investigation or had the report been transcribed on the date of investigation, there is little question that the evidence in question would have been admissible. The Supreme Court has noted that:

> [O]nce the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without

a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the one hand, and the taking of property for use as evidence, on the other. This is true where the clothing or effects are immediately seized upon arrival at the jail, held under the defendant's name in the "property room" of the jail, and at a later time searched and taken for use at the subsequent criminal trial.

United States v. Edwards, 415 U.S. 800, 807 (1974). As stated above, Johnson's property was seized by the FBI, turned over to local authorities, returned to the FBI, and then searched. Although Johnson relies heavily on the date of transcription, December 16, Agent Vera testified that he investigated the items on December 11 or 12, 2001, after receiving them from the local authorities. Although a period of time elapsed between the arrest and the subsequent search of Johnson's property, we conclude that the search was reasonable under the Fourth Amendment. See United States v. Lester, 647 F.2d 869, 874-75 (8th Cir. 1981) (holding that the local authority's seizure of items shortly after the defendant was arrested and the FBI's search of those items the following day was reasonable under the Fourth Amendment). See also United States v. Phillips, 607 F.2d 808, 809-10 (8th Cir. 1979) (holding that a delayed search was reasonable); United States v. Swofford, 529 F.2d 119, 122-23 (8th Cir. 1976) (same).

Johnson further argues that the district court erred in admitting FBI Agent George Roberts's testimony regarding the issuance date of the Illinois identification cards seized from Johnson and Diggs upon their arrests. Johnson carried an identification card in the name of Cedric Miller, and Diggs carried one in the name of Stephen Boyd. Agent Roberts testified that the Illinois Secretary of State's records reflected that the two cards had been issued on the same day.

Johnson argues that Agent Roberts's testimony was prejudicial and impermissible hearsay and that the admission of such testimony violated his Sixth Amendment right of confrontation. Because defense counsel did not object at trial,

we review for plain error.[2] <u>United States v. Olano</u>, 507 U.S. 725, 732 (1993).  Under the plain error rule, an error may be corrected if it is plain, affects the substantial rights of a defendant, and seriously affects the fairness, integrity, or public reputation of judicial proceedings.  <u>Id.</u>  Johnson, Diggs, and Anderson testified that Johnson and Diggs procured their false identification cards on the same day and with Anderson's help.  Agent Roberts's testimony was thus merely cumulative and did not substantially affect Johnson's rights.  Accordingly, Johnson is not entitled to plain error relief.

## B.  Carl Alexander and Terry Brown

Alexander and Brown assert that the evidence is insufficient to support their convictions of conspiracy to distribute and possess with intent to distribute cocaine and PCP.  We review the sufficiency of the evidence *de novo.*  <u>United States v. Alexander</u>, 408 F.3d 1003, 1008 (8th Cir. 2005).  We view the evidence in the light most favorable to the verdict, "'resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict.'" <u>Id.</u> (quoting <u>United States v. Espino</u>, 317 F.3d 788, 792 (8th Cir. 2003)).  We reverse only if no reasonable jury could have found the defendants guilty.  <u>Id.</u>

To establish that Alexander and Brown conspired to distribute cocaine and PCP, the government must prove: (1) that there was a conspiracy, an agreement to distribute

---

[2]Johnson argues that we should review for abuse of discretion because defense counsel objected to the testimony at trial.  A close review of the transcript shows that counsel did not object to Agent Roberts's comparison of the dates, but to the potential hearsay testimony regarding the conversation between the investigator at the Illinois Secretary of State's Office and Agent Roberts.  "We have repeatedly held that objections must be specific and that otherwise we will review evidentiary rulings only for plain error."  <u>United States v. Carter</u>, 410 F.3d 1017, 1023 (8th Cir. 2005).  In any event, any error in admitting the testimony was harmless in light of the government's other evidence against Johnson.

cocaine and PCP; (2) that the defendants knew of the conspiracy; and (3) that the defendants intentionally joined the conspiracy. Id. (citing Espino, 317 F.3d at 792). A conspiracy may be inferred from circumstantial evidence; it need not be proved by direct evidence. Id.

Alexander and Brown argue that they were merely present and that they neither knew of the conspiracy nor took part in it. We conclude that the evidence supports their convictions and that both Brown and Alexander contributed to the conspiracy's success.

For his part, Brown often drove or rode with his codefendants in the chase vehicle. Anderson, Diggs, Bass, and the couriers testified that Brown served in that capacity for the transport of cocaine and PCP. Miller also testified that, after his first trip from California to St. Louis, he returned the vehicle and the drugs to Anderson's house. After the drugs were taken out of the false compartment, Brown drove Miller home. From this evidence, we conclude that a jury could reasonably find that Brown knowingly and intentionally joined the conspiracy.

Similarly, the evidence is sufficient to support Alexander's conviction. According to the testimony of Anderson and Bass, Alexander accompanied them to California and Texas to purchase drugs. Alexander argues that the testimony of his codefendants was unreliable and that he was either merely present or an independent actor. The jury, however, found Alexander's codefendants' testimony credible, and "[w]e give significant weight to the jury's credibility determination." Alexander, 408 F.3d at 1008. From the evidence presented, a jury could reasonably deduce that Alexander knew of, and intentionally joined, the conspiracy.

Alexander and Brown next argue that the district court erred in denying their motions for a new trial based on newly discovered evidence. We review the district court's denial of such motions for abuse of discretion. United States v. Dittrich, 204

F.3d 819, 821 (8th Cir. 2000). A new trial will be granted only if the following five elements are met:

(1) the evidence must have been discovered after the trial; (2) the failure to discover must not be attributable to a lack of due diligence on the part of the movant; (3) the evidence must not be merely cumulative or impeaching; (4) the evidence must be material; and (5) the evidence must be likely to produce an acquittal if a new trial is granted.

Id. (quoting United States v. Ryan, 153 F.3d 708, 713 (8th Cir. 1998)).

Alexander and Brown based their motion on an alleged conversation that took place between Brown and Donald Fults, a drug courier. At trial, Fults testified that Brown and Alexander were members of the conspiracy. In their post trial motions for a new trial, Brown and Alexander alleged that Fults apologized for testifying against Brown and that Fults said that Anderson paid him to testify. Before denying their motions, the district court heard arguments and the testimony of Fults and Corey Williams, an inmate who testified that he had overheard the conversation. Fults denied making the apology and the accompanying statement.

At best, this evidence would serve only to impeach Fults's testimony. Accordingly, we conclude that the district court did not abuse its discretion in denying Alexander's and Brown's motions for a new trial.

Finally, Alexander and Brown raise two constitutional issues. First, they argue that their Sixth Amendment rights were violated when the district court found that they each had one prior felony drug conviction, triggering the mandatory minimum sentence of twenty years' imprisonment under 21 U.S.C. § 841(b)(1)(A). Alexander and Brown invite us to address the constitutionality of utilizing prior convictions to enhance sentences. After the district court handed down their sentences, however, the law in our Circuit became clear: The fact of a prior conviction is a sentencing factor

for the court to decide, not a fact issue for the jury.  E.g. United States v. Gamboa, 439 F.3d 796, 814-15 (8th Cir. 2006) (holding that Almendarez-Torres v. United States, 523 U.S. 224 (1998), is still good law); United States v. Levering, 431 F.3d 289, 295 (8th Cir. 2005) (same); United States v. Carillo-Beltran, 424 F.3d 845, 848 (8th Cir. 2005) (same).  Accordingly, the district court did not err in finding that the defendants' prior convictions triggered the statutory mandatory minimum sentence.

Alexander and Brown also argue that their sentences are so disproportionate to the offense of conviction that they rise to the level of cruel and unusual punishment. Lengthy the sentences may be, but "[w]e have held that mandatory minimum penalties for drug offenses do not violate the Eighth Amendment's prohibition of cruel and unusual punishment."  United States v. Baker, 415 F.3d 880, 882 (8th Cir. 2005) (quoting United States v. Collins, 340 F.3d 672, 679 (8th Cir. 2003)).  We thus reject the appellants' constitutional challenges.

## II.  WIRE FRAUD CONSPIRACY AND MONEY LAUNDERING

Anderson operated a construction business in St. Louis.  In 2001, Diggs told Alexander about a house that Anderson was building and that Alexander could buy the house without providing a down payment.  Alexander wanted to buy it, but because of his criminal history he could not secure a loan to pay for the $269,000 house.  He persuaded his mother, Alexander-Butler,[3] to apply for a loan to finance the house.  To facilitate the sale, Anderson provided the down payment and closing costs, and Alexander promised to give Anderson $10,000, a Mercedes-Benz, and a Hummer.

Alexander-Butler agreed to apply for the loan so that Alexander and his family could live in the Anderson-built house.  The signed loan application stated that

---

[3]At the time of the transaction, Patricia Alexander-Butler's name was Patricia Washington.  For consistency, we will use Alexander-Butler throughout this opinion.

Alexander-Butler earned $7000 per month and had $80,000 in savings. According to her tax returns, her business experienced a net loss in 1999 and 2000 and a small net profit in 2001, and she received about $500 from a pension fund. Her bank statements showed that she did not have more than a few hundred dollars in savings during the relevant period. Because she applied for a stated loan, carrying a higher interest rate, Alexander-Butler did not have to provide specific proof of income, and she was approved for a $215,000 loan. In this process, several faxes were exchanged between the real estate agent and the mortgage broker and the mortgage broker and the lender.

To show that he had received the down payment from the buyer, Anderson went to his bank and purchased a $20,000 cashier's check payable to Anderson from Patricia Alexander-Butler. He redeposited that money into his account and gave the receipt to his real estate agent who, in turn, presented it to the mortgage broker. Because the down payment cost more than Anderson had available to him, he repeated the process with a $15,000 cashier's check.

On the day of the closing, Anderson, Alexander, Alexander-Butler, the real estate agent, and the escrow closing officer gathered at the Commonwealth Title Company. Anderson testified that his real estate agent informed him that an additional $18,000 would be needed, so Anderson and Alexander left the closing to obtain a third cashier's check from Anderson's account. While they were gone, Alexander-Butler changed her mind about signing the documents. To persuade her to sign, Alexander had a private conversation with her, and Anderson offered her $7500. Alexander-Butler eventually signed the documents and closed on the house. Alexander gave Anderson the Mercedes-Benz and moved into the house with his family. Anderson spent the proceeds from the sale to pay Alexander-Butler $7500, to pay back loans, and to buy drugs.

On August 19, 2004, Alexander-Butler and Alexander were charged with conspiracy to commit wire fraud and engaging in monetary transactions in property

derived from unlawful activity. Alexander-Butler was convicted of the first offense, and Alexander was convicted of both.

## A. Patricia Alexander-Butler and Carl Alexander

Alexander-Butler and Alexander challenge the sufficiency of the evidence to convict them of conspiracy to commit wire fraud. As stated above, we review *de novo* the sufficiency of the evidence and view the evidence in the light most favorable to the verdict, giving it the benefit of all reasonable inferences.

To prove conspiracy to commit wire fraud, the government must show (1) that there was a conspiracy, an agreement to commit wire fraud, (2) that Alexander and Alexander-Butler knew of the agreement, and (3) that they intentionally joined in the conspiracy. See United States v. Wintermute, 443 F.3d 993, 1003 (8th Cir. 2006). Alexander's and Alexander-Butler's wire fraud conviction required that the government prove beyond a reasonable doubt (1) that they joined a scheme to defraud, (2) that they intended to defraud, (3) that it was reasonably foreseeable that interstate wire communications would be used, and (4) that the wires were, in fact, used. United States v. Slaughter, 128 F.3d 623, 628 (8th Cir. 1997).

Upon review of the evidence, "resolving all evidentiary conflicts in favor of the government," United States v. Gomez, 165 F.3d 650, 654 (8th Cir. 1999), we conclude that there was sufficient evidence to convict Alexander and Alexander-Butler of conspiracy to commit wire fraud. Alexander-Butler applied for a loan to purchase a house for Alexander because he could not obtain a loan. The evidence showed that each of the alleged conspirators benefitted from this arrangement: Alexander-Butler received $7500 from Anderson, Alexander moved into the house with his family, and Anderson liquidated his assets. Although Alexander-Butler testified that she never told the loan officer that she made $7000 per month or that she had $80,000 in savings, the government presented signed loan documents listing this

-13-

false information. Those documents were faxed to the lender, and the information included therein caused the lender to loan Alexander-Butler the money. Alexander persuaded his mother to sign the documents, attended the closing, promised to give Anderson vehicles and cash for the down payment, and moved into the house. Based on the foregoing evidence, a reasonable juror could conclude that Alexander-Butler and Alexander joined in a conspiracy to commit wire fraud.

## B. Carl Alexander

Alexander argues in his *pro se* supplemental brief that the evidence was insufficient to convict him of engaging in monetary transactions derived from specified unlawful activity. We disagree. A conviction under § 1957 requires a showing (1) that the defendant knowingly engaged in a monetary transaction, (2) that the defendant knew the property involved derived from specified unlawful activity, and (3) that the property was of a value greater than $10,000. United States v. Pizano, 421 F.3d 707, 722 (8th Cir. 2005). The same evidence that supports his conspiracy to commit wire fraud conviction supports this conviction. Accordingly, we affirm his conviction.

Having reviewed the statute of limitations argument raised in Alexander's *pro se* supplemental brief, we conclude that it is without merit and warrants no further discussion.

## CONCLUSION

The convictions and challenged sentences are affirmed.

_____

-14-