# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 02-2764/3037

_____

United States of America,      *
     *
       Cross-Appellant/Appellee,    *
     *   Appeal from the United States
     v.                      *   District Court for the
     *   Northern District of Iowa.
James Randall Sanders,      *
     *
       Appellant/Cross- Appellee.    *

_____

Submitted:  June 12, 2003

Filed:  September 9, 2003 (Corrected: 10/03/03)

_____

Before BOWMAN, MURPHY, and BYE, Circuit Judges.

_____

BYE, Circuit Judge.

James Randall Sanders appeals his conviction, sentence, and the denial of his suppression motions.  The government cross-appeals, challenging the sentence imposed by the district court.  We affirm the conviction, reverse the district court's drug quantity calculation, and remand for re-sentencing.

I

The criminal trial and conviction of Sanders were the culmination of an investigation consisting of at least three separate brushes between Sanders and the

law. Additionally, the government learned the extent of Sander's criminal enterprise during plea negotiations. Each of these four encounters plays an important role in Sanders's appeal and so is described in detail below.

First, on November 4, 1997, on the outskirts of Grinnell, Iowa, a law enforcement officer stopped a vehicle driven by Jeremiah Shaull and also occupied by Sanders, because neither was wearing a seatbelt. After making the stop, the officer discovered that Shaull did not have a valid driver's license and that an arrest warrant had been issued for Sanders. Both men were arrested. Twenty packets of methamphetamine, together totaling 2.6 grams, were discovered in a film canister in Shaull's front pocket. Marijuana, more methamphetamine, drug paraphernalia, and a scale were also found in a pack Shaull was wearing on his belt. Additionally, a large knife was found inside the car.

Second, on April 1, 1998, a deputy sheriff and a reserve deputy sheriff of Benton County, Iowa arrived at Teri Hawkins and Sanders's trailer home to serve civil papers. As the deputies approached, they briefly saw Hawkins watching them from a window. They knocked on the door and it was answered by Tim Rose, Hawkins's adult son, who claimed Hawkins was not at home. The deputies smelled a strong odor of burned marijuana and observed smoke coming from the trailer. Sanders disputed this, claiming he smoked the marijuana long before law enforcement arrived.

Law enforcement asked Rose if he had been smoking marijuana. After a brief pause, Rose denied doing so. Then law enforcement heard a commotion within the trailer. It sounded as if people within the trailer were moving to the back of the trailer. Rose looked nervously in that direction. Law enforcement surmised that the trailer's occupants were trying to destroy evidence, so they entered the trailer and told the occupants to come forward. Sanders came forward, stated he lived in the trailer, and asked to speak with the deputy alone. The deputy agreed, and Sanders led him

-2-

into a small bedroom where Sanders volunteered he had been smoking marijuana and he did not want his friends to get in trouble. He further expressed a willingness to cooperate and commented he did not want to go to jail over "a joint." The deputy suggested Sanders speak with Detective Peter Wright. Sanders agreed.

Wright was called to the scene, and he was joined by Detective Scott Elam. Consent to search the trailer was asked of Sanders and Rose. Though Sanders disputes it, a magistrate judge found at a hearing on a motion to suppress that Sanders consented to a search of the residence. The search uncovered .3 grams of marijuana, 1.71 grams of methamphetamine, numerous small plastic bags, twist ties, and various other drug paraphernalia.

Third, on May 30, 1998, an Iowa state trooper stopped a vehicle for having a defective license plate light. Apparently, though the stop occurred during the mid-afternoon, the vehicle's lights were on because it was a dark, overcast day. Robert Campbell was operating the vehicle, Sanders was in the front passenger seat, and Hawkins was in the back passenger seat. Campbell had a suspended license and there had been another arrest warrant issued for Sanders. Therefore, both men were arrested. Hawkins did not have a valid driver's license either, so the vehicle was towed and an inventory search was conducted pursuant to protocols established by the Iowa State Patrol. The inventory search revealed controlled substances, a knife of about twelve inches in length, a digital scale, numerous small plastic bags, twist ties, and various other drug paraphernalia.

On September 30, 1998, Sanders was indicted. During the pendency of his case, Sanders expressed an interest in cooperating with law enforcement. To facilitate these discussions, an Assistant United States Attorney (AUSA) sent pre-proffer agreements to counsel for all the defendants involved in the alleged conspiracy, including Sanders, explaining that any incriminating statement made during the proffer talks would not be used against the defendant making the

statement. The agreement, however, had a few exceptions, among them that "[a]ny information your client provides during the informal proffer may be used . . . . [i]n the event your client is ever convicted of a criminal charge, by a court for use at the time of sentencing[.]" United States v. Sanders, No. CR 98-55 slip op. at 6-7 (N.D. Iowa July 29, 1999) (Report and Recommendation quoting the pre-proffer letter).

On December 9, 1998, Sanders signed the pre-proffer agreement, but before he did so he specifically asked the AUSA how he could best help himself. The AUSA told Sanders he could substantially reduce his sentence by cooperating. Sanders asked for a more concrete promise, and the AUSA suggested Sanders's sentence might "possibly work down to five years." Sanders believes this was a promise, but admits no other promises were made.

Ultimately, a jury convicted Sanders of (1) conspiracy to distribute and possess with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846; (2) possession with intent to distribute 2.66 grams of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C); and (3) distribution of methamphetamine and marijuana to a person under the age of 21 in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 859.

At sentencing, the district court found that Sanders was responsible for 350 grams of methamphetamine and that, therefore, a base offense level of 30 was appropriate under § 2D1.1 of the United States Sentencing Guidelines (Guidelines). Sanders was sentenced to concurrent terms of 210 months of imprisonment and six years of supervised release on each of the three counts of the conviction. Sanders appeals.

# II

Sanders first contends the evidence was insufficient to support his convictions for conspiracy to distribute and possess methamphetamine and possession with intent to distribute 2.6 grams of methamphetamine. Sanders does not challenge the sufficiency of the evidence underpinning his conviction for distribution of methamphetamine and marijuana to a minor.

The standard of review on this issue is very strict. United States v. Espino, 317 F.3d 788, 791 (8th Cir. 2003). "In reviewing the sufficiency of the evidence on appeal, the court views the evidence in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict." Id. at 792. We will reverse only if no reasonable jury could have found the accused guilty. Id.

A.    Conspiring to Distribute and Possess with Intent to Distribute Methamphetamine.

To prove Sanders conspired to distribute drugs under 21 U.S.C. § 846, the government must establish there was an agreement to distribute drugs that Sanders knew of and intentionally joined. Id. A "[t]acit understanding - as opposed to mere presence at and knowledge of an intended drug sale - will suffice; a formal agreement is unnecessary." Id. "The existence of a conspiracy may be proved by either direct or circumstantial evidence." Id. "Evidence of association or acquaintance, though relevant, is not enough by itself to establish a conspiracy." Id.

The jury concluded the government met its burden, and the evidence supports this conclusion. James Hubbell, Shaull, and Linda Smith each testified they assisted Sanders's methamphetamine distribution activities by driving Sanders to various

locations to purchase methamphetamine from various suppliers. Hubbell and Shaull each described assisting Sanders in weighing and packaging the methamphetamine for resale. Hubbell admitted purchasing dozens of bottles of Fed 7, a brand of pseudoephedrine, for use in cutting the methamphetamine. Hubbell, Shaull, and Smith also testified regarding the roles of Rose and Hawkins as drivers and procurers of Fed 7 pseudoephedrine. This testimony was consistent with the corroborating seizures of methamphetamine, scales, weapons, plastic bags and other drug paraphernalia. Clearly, on this evidence, a reasonable jury could find that Sanders knew of and intended to join the conspiracy.

B.     Possession With Intent to Distribute Methamphetamine

Sanders also contends the evidence is insufficient to sustain his conviction for possession with intent to distribute 2.6 grams of methamphetamine seized from Shaull during the November 1997 traffic stop.

To convict Sanders of possession of methamphetamine with intent to distribute, the government must show he possessed the drug and did so with the intent to distribute. United States v. Oleson, 310 F.3d 1085, 1089 (8th Cir. 2002). The fact that the methamphetamine was discovered on Shaull rather than on Sanders complicates the government burden, but, of course, possession may be constructive as well as actual. E.g., Ortega v. United States, 270 F.3d 540, 545 (8th Cir. 2001).

"To prove constructive possession, the government had to present evidence that appellants had knowledge and ownership, dominion or control over the contraband itself, or dominion over the vehicle in which the contraband is concealed." Id. (internal quotation and citation omitted). Furthermore, possession may be exclusive or joint. Id. But "mere presence as a passenger in a car from which the police recover contraband . . . does not establish possession." Id. (internal quotation and citation

omitted). Likewise, "mere association with persons who possess drugs is insufficient to show constructive possession." Id.

In this case, the government presented evidence showing more than mere presence or association. Shaull testified Sanders had given him the methamphetamine to carry shortly before the traffic stop. Furthermore, government witnesses testified Sanders, not Shaull, was in the illegal drug trade. Thus, there is support for the jury's determination that Sanders had constructive possession of the illegal drugs.

This leaves the question of Sanders's intent. In his brief, Sanders claims the methamphetamine was for his personal use and it was not his intent to distribute the drug. He draws attention to Agent Wright's testimony indicating some methamphetamine users do use a gram or more a day. He further insists all the other evidence seized at the November traffic stop was indicative of personal use only.

"Intent to distribute controlled substances may be proved by either direct evidence or circumstantial evidence." United States v. Schubel, 912 F.2d 952, 956 (8th Cir. 1990). Even a small amount of contraband may combine with circumstantial evidence to support a finding of intent to distribute. United States v. Alvarez, 254 F.3d 725, 727 (8th Cir. 2001) (affirming jury verdict on charge of possession with intent to distribute when defendant was found to possess only 2.4 grams of methamphetamine at time of arrest). The presence of equipment to weigh and measure the narcotics, paraphernalia used to aid in their distribution, and large sums of cash are common indicia of drug trafficking and are all circumstantial evidence of intent to distribute. Schubel, 912 F.2d at 956.

Here the methamphetamine was seized from a vehicle which also contained paraphernalia, a scale, and a large knife. Additionally, the 2.6 grams of methamphetamine had been divided into twenty packets, each containing about a

one-quarter gram of methamphetamine. This evidence is sufficient to support the jury's verdict.

III

Sanders next argues the district court erred in denying his motion to suppress his proffer statements. He contends he involuntarily and unknowingly agreed to the waiver contained in the pre-proffer agreement. He argues, further, that the government's records of the conversations and of his statements are unreliable. We disagree.

We review the factual findings of a district court under the clear error standard, and review de novo conclusions of law based on those factual findings, such as whether a Miranda[1] waiver was valid or a confession was voluntary. United States v. Syslo, 303 F.3d 860, 865 (8th Cir. 2002). Both parties agree this standard governs the voluntariness of the pre-proffer agreement.

Sanders never actually reached a plea agreement with the government, but he did enter into plea negotiations during which he made several incriminating statements. These statements were not used at trial but were used at sentencing. Proffer discussions that do not result in a guilty plea normally are not admissible against a defendant. United States v. Mezzanatto, 513 U.S. 196, 197 (1995). A defendant, however, may waive this protection in whole or in part. Id. at 210.

The proffer agreement states, in the relevant part: "Any information your client provides during the 'informal proffer' may be used . . . [i]n the event your client is ever convicted of a criminal charge, by a court for use at the time of sentencing[.]" Sanders acknowledges he and his attorney read the proffer agreement. He also admits

---

[1]Miranda v. Arizona, 384 U.S. 436, 473 (1966).

-8-

he signed the agreement. He argues, however, that merely reading the agreement before signing, and having it only generally explained (rather than explained "paragraph by paragraph") by the AUSA led him to believe the waiver only applied to future prosecutions and not to his pending charges.

To succeed, Sanders must show more than that he misunderstood the extent of his waiver or its ramifications; he must show his will was overborne. Cf. United States v. Peck, 161 F.3d 1171, 1174 (8th Cir. 1998) ("Lack of awareness of the potential adverse impact of statements is not sufficient in itself to invalidate a waiver of the right to counsel"); United States v. Johnson, 47 F.3d 272, 277 (8th Cir. 1995) (rejecting the argument that defendants must be warned of the potential sentencing consequences of waiving their right to remain silent); Jenner v. Smith, 982 F.2d 329, 333 (8th Cir. 1993) (saying that a statement is not involuntary unless "the police extorted it from the accused by means of coercive activity"). Sanders cannot meet this burden. There is no evidence that Sanders's will was overborne.

Sanders argues, further, that it was error to consider his proffer statements at sentencing because the government's reports of those interviews were inaccurate. The government effectively responds to this argument by explaining that the sentencing court relied on Sanders's version of his proffer statements. Accordingly, Sanders's argument fails.

IV

Sanders also argues that law enforcement entered his house without his consent in violation of the Fourth Amendment. We disagree.

Whether Sanders voluntarily gave consent is a question of fact; this court will review the district court's conclusions on such questions for clear error only. United States v. Jones, 254 F.3d 692, 695 (8th Cir. 2001). "A finding is 'clearly erroneous'

when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).

The Fourth Amendment, made applicable to state actors by the Fourteenth Amendment, United States v. Ameling, 328 F.3d 443, 447 (8th Cir. 2003), protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and it requires probable cause for lawful searches and seizures. U.S. CONST. amend. IV. Generally, to search a private place, person, or effect, law enforcement must obtain a warrant supported by probable cause from a judicial officer. E.g., Katz v. United States, 389 U.S. 347, 357 (1967) ("Searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions.") (footnotes omitted). Where one voluntarily consents to a search, however, law enforcement need neither a warrant nor probable cause to legally execute the search. United States v. Matlock, 415 U.S. 164, 171 (1974); Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973).

When a defendant claims he or she did not consent voluntarily to a search which revealed evidence of criminal activity, the government must show by a preponderance of the evidence that, under the totality of the circumstances, the defendant did voluntarily consent for the challenged evidence to survive a suppression motion. E.g., United States v. Severe, 29 F.3d 444, 446 (8th Cir. 1994). In this case, the government relied upon the testimony of law enforcement officials involved in the encounter. They testified that consent was orally given. Sanders also testified, claiming he did not consent. The district court believed law enforcement. "A district court's determination as to the credibility of a witness is virtually unreviewable on appeal." United States v. Heath, 58 F.3d 1271, 1275 (8th Cir. 1995). In fact, "[a] district court's decision to credit a witness's testimony over that of another

can almost never be a clear error unless there is extrinsic evidence that contradicts the witness's story or the story is so internally inconsistent or implausible on its face that a reasonable fact-finder would not credit it."  Id.

Here the district court was faced with two different versions of the events and chose to credit law enforcement's version.  There was no extrinsic evidence to contradict this version, and so the district court did not err in rejecting Sanders's version.

V

Additionally, Sanders alleges prosecutorial misconduct during grand jury proceedings mandates reversal of his conviction.  We disagree.  Even if we were to assume there was prosecutorial misconduct during the grand jury proceedings, the petit jury's guilty verdict rendered those errors harmless. United States v. Kouba, 822 F.2d 768, 774 (8th Cir. 1987).  "Except in cases involving racial discrimination in the composition of the grand jury, a guilty verdict by the petit jury excuses errors at the grand jury level that are 'connected with the charging decision.'"  Id.  The guilty verdict means Sanders was "guilty as charged beyond a reasonable doubt.  Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt." United States v. Exson, 328 F.3d 456, 460 (8th Cir. 2003) (quoting United States v. Mechanik, 475 U.S. 66, 70, (1986)).  Therefore, the district court did not err in denying Sanders's motion to dismiss the indictment because of any alleged abuse during the grand jury proceedings.

The government cross-appeals, making two arguments. First, the government asserts the district court erred in refusing to apply an upward adjustment for perjury pursuant to § 3C1.1 of the Guidelines. We disagree.

The factual finding underlying an enhancement for obstruction of justice is reviewed for clear error; application of the sentencing guidelines to those facts is subject to de novo review. United States v. O'Dell, 204 F.3d 829, 836 (8th Cir. 2000).

As discussed in section IV of this opinion, at the suppression hearing the magistrate judge was confronted with two different versions of the events and chose to credit law enforcement's version. The magistrate rejected Sanders's testimony in which he claimed he did not consent to the search. The magistrate stated:

> The defendant testified that Detective Wright never asked for a consent to search the trailer. He contends that Detective Wright simply stated that he didn't need a search warrant because the police smelled marijuana. The only thing that defendant admits about consenting to the search of his residence, is that when Detective Wright accused him of operating a methamphetamine lab, Sanders stated, "I said look around, do you see a lab? I said there's no lab here." The court does not believe the defendant.

> This defendant has been extremely cooperative with police on virtually every encounter. He was anxious to immediately cooperate with Deputy Wright and also wanted to show Deputy Wright that he would cooperate. Even after he got indicted, the defendant was anxious to try and talk his way out of these charges at the proffer session discussed below. The court believes the defendant voluntarily and quickly gave consent for the search of his residence.

. . . .

> The defendant does not make the typical argument that his consent was not freely and voluntarily given. This defendant contends that he never gave consent for the search of his trailer. For the reasons set forth in the findings of fact above, the court believes the defendant did in fact, consent and was anxious to do so.

United States v. Sanders, No. CR 98-55 slip op. at 4-5 and 13-14 (N.D. Iowa July 29, 1999) (Report and Recommendation).

The district court adopted the magistrate judge's findings stating "[t]he court has conducted a de novo review of the report and recommendation and carefully considered each of the defendant's objections. The court concludes that the report and recommendation should be adopted and the motions denied as recommended by Judge Jarvey." United States v. Sanders, No. CR 98-55 slip op. at 1 (N.D. Iowa Dec. 8, 1999) (Order adopting Report and Recommendation). Nonetheless, at the sentencing hearing the district court sustained Sanders's objection to the adjustment, stating:

> As far as the testimony at the suppression hearing, although it was found against Mr. Sanders on that issue, there is just so much dispute about this – and again, DEA policies were violated, the way this was handled, and that could have resolved this very easily – I'm just not convinced that the suppression testimony rises to the level of obstruction. And I'm not willing to assess an obstruction of justice enhancement based upon that testimony alone, and I cannot find, based upon what I reviewed of the record, that there was the type of willful testimony taken on the record under oath that would warrant an obstruction enhancement, so I'm going to sustain that objection.

Sentencing Transcript at 167-68.

-13-

Here, the district court did not make a finding of perjury even though it did not believe Sanders's testimony. Without such a finding an enhancement is not required. United States v. Iversen, 90 F.3d 1340, 1342 (8th Cir. 1996) (holding because the district court did not make a finding of perjury an enhancement for obstruction was not required). Thus, it was not error for the district court to refuse to impose the adjustment.

VII

The government's second argument is that the district court erred in calculating drug quantity. We agree.

We will reverse a district court's determinations regarding drug quantity only upon a finding of clear error. United States v. Symonds, 260 F.3d 934, 936 (8th Cir. 2001). The district court determined Sanders was responsible for only 350 grams of methamphetamine, triggering a base offense level of 30 under § 2D1.1 of the Guideline. The government insists at least 500 grams of methamphetamine were involved, triggering a base offense level of 32. In making its drug quantity determination, the district court stated:

> I'm going to start at a level thirty. And in so doing, I'm giving the defendant the substantial benefit of the doubt, but I'm also taking into consideration several important factors in this case. One, I think if there's one thing we've learned from the United States Supreme Court over the past years, it's that we are to give a certain amount of deference, and I would say great deference, to juries, and I have always felt that. I'm not bound by that. And I am obviously going to sentence him at a level between 350 and 500 grams. But certainly the jury, and I think very rightly, had serious concerns about the credibility of a number of the Government's witnesses. We have, in the Government's calculation, almost 350 grams of methamphetamine that Deb Sadler says she didn't even sell to Mr. Sanders. I don't know who we believe in that scenario

-14-

when the Government calls Ms. Sadler as a witness and she testified that she didn't sell the drugs. Do I believe Ms. Sadler then, or do I believe it some other way? I don't know, but in any event, I think taking a very conservative approach, and considering Mr. Sanders' own statements, that at least 350 grams of methamphetamine were involved here.

I'm also taking into consideration the fact that a lot of the methamphetamine – purported methamphetamine in this case was actually Fed 7, and I'm not convinced that the parties who were using and trading the Fed 7 didn't know it was Fed 7. A lot of Fed 7 was used personally by Mr. Sanders and Teri Hawkins, and to some extent, Mr. Rose, and they clearly knew what they were using, and I don't think those are quantities – personal use quantities of Fed 7, by people who knew it was Fed 7, I don't think can be used as part of the methamphetamine calculation.

And in any event, I think I'm giving Mr. Sanders an extreme benefit of the doubt when going to under 500 grams, but I do think essentially 350 grams of methamphetamine based upon his own statements in this case.

Sentencing Transcript at 163-65.

The district court, thus, relied on three grounds for giving the defendant "the benefit of the doubt." First, the court gave deference to the jury on the question of drug quantity. Second, the district court discredited a government witness. Third, the district court reasoned some of the substance trafficked was not methamphetamine. We consider each in turn.

First, the jury found Sanders guilty of Count 1, conspiracy to distribute and possess with intent to distribute methamphetamine; and the jury found the amount involved to be less than 100 grams. Once the jury did so, however, it was the district court's responsibility to determine drug quantity, not the jury's. See United States v. Titlbach, 300 F.3d 919, 921 (8th Cir. 2002). Of course, in light of Apprendi v. New

-15-

Jersey, 530 U.S. 466 (2000), the sentence must not exceed the maximum sentence prescribed for the crime of which the appellant was properly convicted. Nonetheless, the fact that the duty to calculate drug quantity rested on the judge, coupled with the fact that the drug quantities attributable to Sanders from the proffer talks were not before the jury, makes the district court's deference to the jury on the point erroneous.

Second, the district court credited Deb Sadler's testimony in which she claimed she did not sell methamphetamine to Sanders. "The law is well-settled that a district court's assessment of witness credibility is quintessentially a judgment call and virtually unassailable on appeal." United States v. Causor-Serrato, 234 F.3d 384, 390 (8th Cir. 2000). The government, however, notes that during the proffer talks Sanders admitted to obtaining a total of 800.87 grams of methamphetamine from various sources. These amounts are uncontested. Further, the government notes Sanders claims to have received 170.1 grams from Sadler in six installments, and an additional 56.7 grams in a seventh installment, for a total of 236.8 grams. If this amount is deducted from the total of 800.87 grams, one is still left with 574.07 grams of methamphetamine, obviously more than 500 grams. Therefore, the base level offense should have been 32 rather than 30.

Third, it was, of course, acceptable for the district court to refuse to attribute Fed 7 to Sanders as methamphetamine. The Fed 7 amounts, however, did not figure in the government's arithmetic to begin with.

Therefore, even allowing for the district court's rejection of Sadler's trial testimony, Sanders is still responsible for more than 500 grams of methamphetamine, and the district court clearly erred in establishing drug quantity otherwise.

VIII

Accordingly, we affirm the judgment of conviction. We reverse the sentence, however, and remand for resentencing consistent with this opinion.[2]

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[2]Sanders submitted his own pro se brief to supplement the work of his defense counsel. In this second brief, Sanders raises six issues which taken together, he claims, deprived him of a fair trial. Even though "it is not the court's practice to consider pro se briefs filed by parties represented by counsel," United States v. Peck, 161 F.3d 1171, 1175 n.2 (8th Cir. 1998), we have considered these claims and summarily reject them. See 8th Cir. R. 47B(1) & (4).