# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 03 -3476

———————

United States of America,     *

      *

     Plaintiff - Appellee,     *

      *    Appeal from the United States

    v.       *    District Court for the

      *    Eastern District of Missouri.

Lonnie Dwayne Payne,     *

      *

     Defendant - Appellant.     *

———————

Submitted: April 13, 2004
Filed: August 5, 2004

———————

Before LOKEN, Chief Judge, RICHARD S. ARNOLD and FAGG, Circuit Judges.

———————

LOKEN, Chief Judge.

Lonnie Dwayne Payne was charged in a multi-defendant indictment with conspiracy to possess with intent to distribute more than five kilograms of cocaine and with being a felon in possession of a firearm. See 21 U.S.C. §§ 841(a)(1), 846; 18 U.S.C. § 922(g). A jury found Payne guilty on both counts. The district court[1] sentenced Payne to 324 months in prison and ten years of supervised release. Payne appeals, challenging the sufficiency of the evidence and the district court's denial of a minor role reduction. We affirm.

_____

[1]The HONORABLE CHARLES A. SHAW, United States District Judge for the Eastern District of Missouri.

## I. Sufficiency of the Evidence

Payne first argues that the trial evidence is insufficient to convict him of the drug conspiracy and firearm offenses. "When considering a challenge to the sufficiency of the evidence used to convict a defendant, we review the evidence in the light most favorable to the verdict, and give the verdict the benefit of all reasonable inferences which might be drawn from the evidence." United States v. Beaman, 361 F.3d 1061, 1064 (8th Cir. 2004) (quotation omitted). "We will reverse the conviction only if we can conclude from the evidence that a reasonable fact finder must have entertained a reasonable doubt about the government's proof concerning one of the essential elements of the crime." United States v. Jimenez-Serrato, 336 F.3d 713, 714 (8th Cir. 2003) (quotation omitted).

## A. The Drug Conspiracy Offense.

The government introduced overwhelming evidence that Payne's nephew, Leroy Eason, was the leader of a drug conspiracy that obtained large quantities of cocaine in Dallas and distributed it in St. Louis between July 1998 and September 2001. Payne does not dispute the existence of the conspiracy, only whether the government proved that he "knew of . . . and . . . intentionally joined the conspiracy." United States v. Espino, 317 F.3d 788, 792 (8th Cir. 2003). "Once a conspiracy has been established, only slight evidence is needed to link a defendant to the conspiracy." United States v. Pena, 67 F.3d 153, 155 (8th Cir. 1995).

The government presented the following evidence that Payne was an active participant in his nephew's drug trafficking conspiracy:

-- Conspirator Maurice Chatman testified that he accompanied Eason on a number of trips to Texas to obtain cocaine. Before one trip, Chatman, Eason, and Payne met and arranged that Payne would drive his car to Dallas on the pretense of

seeking treatment for foot problems at a Veterans Administration clinic. Eason had installed a hidden compartment in Payne's car and wanted to use the car to transport five kilograms of cocaine to St. Louis. Chatman then rode with Eason in a rented car to Eason's condominium near Dallas, where Payne's car was waiting. Chatman helped Eason package seven kilograms of cocaine to avoid detection by drug dogs, watched Eason load five kilograms into the hidden compartment in Payne's Grand Prix, and drove Payne's car back to St. Louis. Eason provided Chatman with a document showing Payne's admission to the V.A. clinic so that Chatman, if stopped for a traffic violation, could explain why he was driving Payne's car back to St. Louis. Payne and Eason returned to St. Louis separately. Conspirator Marcus Davis testified that Eason installed the hidden compartment in Payne's car because police seized Davis's similarly-equipped Grand Prix that Eason had used to transport cocaine from Dallas to St. Louis.

-- Conspirator Frederick Smith testified that he obtained fifteen to twenty kilograms from Eason in the year before Smith was indicted. Eason delivered the cocaine at his grandmother's house. Smith saw Payne at the house three to five times, where Payne witnessed exchanges of money for cocaine. On one occasion, Smith testified that Payne remarked, "I guess you're doing pretty good, you and [Eason], you know, you come see him pretty often so I guess things going real well."

-- Government investigators placed pen registers and later a wiretap on Eason's cell phones. Between November 2000 and July 2001, they registered 598 phone contacts between Payne and Eason. The most incriminating conversations were played for the jury at trial. They recorded Payne advising Eason about being under surveillance and not letting one of the conspirators out of the conspiracy, discussing the trip to Virginia that led to the firearms charge and a DEA forfeiture notice, and requesting money and other financial assistance from Eason, which he invariably provided.

-- When Payne's brother wrote from prison warning of Eason's criminal history and lack of trustworthiness, Payne replied, "I understand everything you are saying."

We conclude that a reasonable jury could find this evidence, along with the evidence of the Virginia trip discussed in detail in connection with the firearm charge, more than sufficient to prove beyond a reasonable doubt that Payne was a knowing participant in the drug conspiracy. Payne argues there was insufficient proof he intentionally joined the conspiracy. But "a formal agreement is unnecessary." United States v. Sanders, 341 F.3d 809, 815 (8th Cir. 2003), cert. denied, 124 S.Ct. 1525 (2004). Payne's active involvement in the trips to Virginia and to Dallas and his frequent communication with Eason about the conspiracy reflect more than mere association with Eason and mere presence when illegal activity occurred.

## B. The Firearm Offense.

The indictment charged Payne with being a felon in possession of "two Jennings 9mm handguns, serial numbers 1405990 and 1405985." Payne stipulated to a prior felony conviction. At trial, the government presented the following evidence that he knowingly possessed the handguns.

In March 2001, investigators intercepted a series of phone calls from Eason to Payne in which they arranged a trip to Richmond, Virginia with Steven Lacy for the purpose of making a $100,000 down payment on contracts for the rights to hold rap concert after-parties. In the first call, Eason told Payne to bring the "birthday present you had got for Rashad. . . . The one that you ain't never give to him." Payne apparently did not understand the reference, but when Eason again told Payne to bring the "birthday gift" in the next call, Payne said, "All right. I read you loud and clear." In a third call, Eason said, "you know, we do need two of them."

The St. Louis investigators believed that the $100,000 would be illegal drug proceeds. They alerted Kentucky law enforcement officials who stopped Eason's car for a traffic violation near Lexington, Kentucky. Eason was driving, Lacy was in the passenger seat, and Payne was in the back seat. A consent search uncovered the two brand new handguns and ammunition hidden in a secret compartment in the console between the two front seats. The police found over $100,000 in cash hidden in a rear cargo door panel. The three occupants were arrested for firearms violations.

Lacy testified that he wanted Eason's financial support for Lacy's entertainment business and therefore agreed to claim ownership of the guns and money and plead guilty to a misdemeanor firearm offense. Eason and Payne, as convicted felons, would have been guilty of felony offenses. Payne took part in one or more of the subsequent conversations in which Eason and Lacy discussed his pleading guilty to the firearm offense and helping Eason contest the government's notice that the $100,000 was subject to forfeiture. During Lacy's testimony, the government played a recorded phone call between Eason and Lacy in which Eason referred to the handguns as "Air Force Ones." Lacy explained: "Air Force Ones are tennis shoes, and he was saying that the guns were like Air Force Ones, if you get a pair of the new tennis shoes and they never been worn, they never touched the ground . . . that's what the guns were like, they had never been used."

Payne argues that the government proved neither actual nor constructive possession of the handguns, only his presence as a passenger in Eason's car who had neither dominion nor control over either the vehicle or the console in which the guns were hidden. We have repeatedly stated that "[m]ere presence as a passenger in a car from which the police recover contraband or weapons does not establish possession." United States v. Madkins, 994 F.2d 540, 541 (8th Cir. 1993) (quotation omitted). The district court properly instructed the jury that "[a] person may have actual possession or constructive possession. A person may have sole or joint possession. . . . If two or more persons share actual or constructive possession of a thing, possession is joint."

See United States v. Wells, 721 F.2d 1160, 1162 (8th Cir. 1983). Constructive possession may be proved by circumstantial evidence. See United States v. Garrett, 961 F.2d 743, 747 (8th Cir. 1992).

Eason asked Payne in a phone call to bring two "birthday presents" on a long car trip during which they would be carrying $100,000 in cash. Eason and Payne were wary of electronic surveillance, so as convicted felons they would be unlikely to discuss firearms over the phone except in code. Lacy testified that Eason later referred to the handguns as Air Force Ones -- brand new guns, like birthday presents. After their arrest, Payne helped Eason persuade Lacy to plead guilty to a misdemeanor firearm offense to deflect felony charges against Eason and Payne. From this evidence, a reasonable jury could find that Payne had actual possession of the handguns when he retrieved and delivered them to Eason for the purpose of protecting their cash. At a minimum, the close personal relationship between Payne and Eason and their joint undertakings provided sufficient evidence of constructive joint possession of the guns in the console. See United States v. Koskela, 86 F.3d 122, 127 (8th Cir. 1996); Eason v. United States, 281 F.2d 818, 821 (9th Cir. 1960).

## II. Minor Role Reduction

Payne argues that the district court erred in refusing to grant his request for a two-level downward adjustment because he was a "minor participant" in the drug conspiracy. See U.S.S.G. § 3B1.2(b). The adjustment would have a substantial impact under the guidelines, reducing Payne's sentencing range below the applicable statutory minimum of 240 months. See 21 U.S.C. § 841(b)(1)(A); U.S.S.G. §§ 2D1.1(a)(3), 5G1.1(b).

"The determination of whether the defendant played a minor role in the offense is a question of fact, which we review for clear error." United States v. Bush, 352 F.3d 1177, 1181 (8th Cir. 2003). Payne must prove that he "is less culpable than

most other participants, but [his] role could not be described as minimal." U.S.S.G. § 3B1.2 comment. (n.5); United States v. Rumbo-Rosendiz, 340 F.3d 598, 601 (8th Cir. 2003). "A defendant's role in the offense is measured by the relevant conduct for which he is held responsible. Once the district court has determined the relevant conduct, each participant's actions should be compared against the other participants, and each participant's culpability should be evaluated in relation to the elements of the offense." United States v. Johnston, 353 F.3d 617, 626 (8th Cir. 2003) (quotation and citation omitted), cert. denied, 124 S.Ct. 2403 (2004).

At sentencing, Payne argued that the lack of evidence linking him to the conspiracy established his minor role. In response, the government reviewed the trial evidence of Payne's involvement and argued that he "may have been a helper, but he was a right-hand man type helper . . . . and a confidante to Leroy Eason, which, in fact, allowed Mr. Eason to be as successful as he was." The district court ruled:

> I also heard that evidence. And from the jury's finding of guilt in this case, I do not see a minor or minimal role situation either from the jury's verdict, the number of calls, the car situation, the compartments there, the testimony relative to making the appointment at the Veterans Hospital and so forth. It would seem that the jury could easily and reasonably conclude that beyond just the average role, you might -- Mr. Payne might have been the brains of the operation. So that would be a situation where he was a leader or whatever else.
>
> But that perhaps may be a stretch also, just like it might be a stretch to say minimal or minor role. So I think it's probably proper right where it is. . . . So that objection is overruled.

Based on the trial evidence, Payne was no doubt less culpable than Eason and perhaps one or two other conspirators as well. But "merely showing the defendant was less culpable than other participants is not enough to entitle the defendant to the adjustment if the defendant was 'deeply involved' in the offense." Bush, 352 F.3d

at 1182. Payne allowed his car to be modified to secretly transport cocaine. He then drove the car to Texas and made a phony admission to the V.A. clinic to provide an alibi for courier Chatman, who used the car to bring five kilograms of cocaine back to St. Louis. Payne provided firearms for protection on a trip with Eason to launder drug proceeds in Virginia. Given these highly incriminating incidents, and Payne's frequent in-person and telephone contacts with Eason, which included giving on-going advice to Eason regarding the conspiracy, the district court's finding that Payne played more than a minor role is not clear error.

Payne argues that he is entitled to a minor role reduction because his sentence greatly exceeds the 211-month sentence imposed on ringleader Eason. Although the sentence disparity is substantial, we may not reduce a defendant's guidelines offense level "because his coconspirators were the ringleaders and received less severe sentences." United States v. Crosby, 96 F.3d 1114, 1115 (8th Cir. 1996).

Finally, Payne argues that the district court's reference to the jury's finding of guilt means that the court "misapprehended its legal authority to reduce Mr. Payne's offense level for his role in the offense." We disagree. The court explicitly based the denial of a minor role reduction on the court's recollection of the evidence at trial. This is a proper basis for a court's sentencing findings. See United States v. Roberts, 953 F.2d 351, 354 (8th Cir.), cert. denied, 505 U.S. 1210 (1992). We construe the court's reference to the verdict as simply noting that the jury confirmed the court's independent view of that evidence.

The judgment of the district court is affirmed. We deny the motion to strike.

_____