# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3976

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Nebraska. |
| Haider Alyass, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: April 17, 2009
Filed:   July 6, 2009

_____

Before RILEY, BENTON, and SHEPHERD, Circuit Judges.

_____

RILEY, Circuit Judge.

A jury found Haider Alyass (Alyass) guilty of conspiracy to distribute and possess with intent to distribute methamphetamine, and the district court[1] entered judgment against Alyass, sentencing Alyass to 292 months imprisonment. On appeal, Alyass argues the evidence was insufficient to support the jury's verdict. We affirm.

_____

[1]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska.

## I. BACKGROUND

On April 24, 2008, a grand jury returned a one count indictment charging Alyass with conspiracy to distribute and possess with intent to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1), and 846. Alyass pled not guilty to the charge.

A jury trial began on September 29, 2008. The government presented the testimony of two law enforcement officers, Sergeant Norman Cobb (Sergeant Cobb) and Investigator David Hanselmann (Investigator Hanselmann), and eight cooperating witnesses, Kristina Turco (Turco), Tom Hurst (Hurst), Haithem Alamiri (Alamiri), Everett Cuevas (Cuevas), Sherry Rose (Rose), Jeremiah Crosby (Crosby), Rebecca Zimbelman (Zimbelman), and Christopher Eynon (Eynon). Each witness testified to Alyass's involvement in the conspiracy.

Turco testified at the trial under a nonprosecution agreement. Turco reported Alyass was her ex-boyfriend and the father of Turco's son. Turco stated she had been using methamphetamine from another supplier when she met Alyass, and she began receiving her methamphetamine from Alyass in late 2004 or early 2005. Turco explained, as a former methamphetamine seller, she taught Alyass where to get methamphetamine, how much it cost, and how to weigh it.

According to Turco, in November 2006, Alyass moved to Lincoln, Nebraska, where he lived with an individual named Kadhem Albumohamed. Alyass began leaving methamphetamine at Turco's residence in York, Nebraska, and people would purchase the methamphetamine from Turco. Turco said she collected the money and held it for Alyass, unless he gave her permission to use the money to pay bills. Turco dispersed approximately two ounces of methamphetamine for Alyass every week and collected $900 per ounce. The people purchasing the methamphetamine usually prearranged the quantity with Alyass before arriving at Turco's residence. Turco

affirmed this practice continued until Alyass moved to South Dakota in the late summer of 2007.

Hurst also testified at Alyass's trial pursuant to a nonprosecution agreement. Hurst lived with Alyass for two or three months in early 2006. Hurst indicated he began to work for Alyass, driving Alyass from Lincoln to York and Columbus, Nebraska, because Alyass did not have a driver's license. Hurst admitted Alyass sometimes had Hurst deliver methamphetamine to people.

Alamiri testified pursuant to a federal cooperating plea agreement. Alamiri and Alyass first met in Saudi Arabia, and the two became good friends. Alamiri stated he began to obtain methamphetamine from Alyass in 2006. Alamiri moved in with Alyass, and Alamiri began delivering drugs for Alyass to York. Alamiri explained Alyass traveled with him to deliver drugs, and Alamiri carried the drugs in his pocket. Alamiri stated he handed the drugs to the buyers, and Alyass kept the money. Alamiri and Alyass worked together for approximately one year. Alamiri said Alyass permitted Alamiri to live with him, and Alyass let Alamiri take methamphetamine from the drug deals in exchange for helping Alyass deliver drugs.

Cuevas, the boyfriend of Turco's mother, also testified pursuant to a nonprosecution agreement. Cuevas began to sell methamphetamine in 2006 to earn money to support his own methamphetamine addiction. Cuevas purchased the methamphetamine from Alyass. Cuevas explained he would call Alyass when he wanted methamphetamine, and either Alyass, Hurst, or Alamiri would bring him the drugs in exchange for money. Cuevas paid between $1,100 and $1,400 per ounce of methamphetamine. Cuevas bought an ounce of methamphetamine every week for a period of about three months.

Cuevas contacted law enforcement officers in July 2007 "[b]ecause the drugs [were] destroying [his] life." Cuevas had two interviews with Investigator

Hanselmann, and Cuevas agreed to record a telephone call to Alyass. In the call to Alyass, Cuevas did not ask for methamphetamine, but Alyass knew what quantity of methamphetamine Cuevas would want because the quantity was always the same. The transaction was never completed.

Rose agreed to testify against Alyass under a nonprosecution agreement with the government. Rose reported she met Alyass through a mutual friend in January 2007. The following month, Rose began to purchase methamphetamine from Alyass. Rose would call Alyass, and either Alyass, Hurst, or Alamiri would deliver the drugs to Rose, or Rose would pick them up from Alyass in Lincoln. Initially, Rose purchased approximately one "teener" (1.75 grams) every one to two weeks, but later she was purchasing an "eight ball" (3.5 grams) once or twice a week. Rose purchased methamphetamine from Alyass for a period of approximately three months.

Crosby testified pursuant to an agreement with the York County Attorney's Office. Crosby stated he had known Alyass for approximately four years, and in November 2006, Crosby began to purchase methamphetamine from Alyass to sell. Crosby purchased the methamphetamine on a front, and Alyass gave him a three-day grace period in which to pay Alyass for the drugs. Crosby obtained the drugs by calling Alyass, and Crosby either picked the drugs up from Alyass in Lincoln or from Turco in York, or the drugs were delivered to Crosby in York. Crosby said he started out buying one eight ball of methamphetamine at a time, but later he was buying two or three eight balls at a time, and admitted a few times he may have bought four eight balls at once. Crosby estimated he exclusively bought drugs from Alyass over a period of four to six months.

Zimbelman also testified pursuant to an agreement with the York County Attorney's Office. Zimbelman met Alyass in March 2007, and she and her boyfriend, Eynon, began to purchase methamphetamine from Alyass. Zimbelman stated she bought one half ounce of methamphetamine from Alyass every week until January

2008, and Alyass delivered the methamphetamine to Zimbelman's and Eynon's residence every Friday.

Like Zimbelman, Eynon testified pursuant to an agreement with the York County Attorney's Office. Eynon first met Alyass at the end of 2006. Two or three weeks later, Eynon began to purchase methamphetamine from Alyass. Alyass generally would deliver the drugs from Lincoln to York, but occasionally Eynon would pick the drugs up in Lincoln. Eynon stated he typically purchased one half ounce of methamphetamine once or twice a week to sell to Eynon's coworkers. Eynon discontinued buying from Alyass around May 2007 after Eynon was arrested for driving under the influence of methamphetamine, lost his job, and was no longer able to sell methamphetamine at his workplace.

Sergeant Cobb, an officer with the York Police Department, and Crime Stopper program coordinator, reported he received drug-related information concerning Alyass from the Crime Stopper telephone tip line on March 22, 2007. Sergeant Cobb forwarded the Crime Stopper report to Investigator Hanselmann of the Nebraska State Patrol.

Investigator Hanselmann is assigned to the Rural Apprehension Program, a drug task force serving ten counties in rural southeast Nebraska. Investigator Hanselmann interviewed Hurst in connection with the Crime Stopper report. At that time, Hurst provided Investigator Hanselmann with a telephone number, and Investigator Hanselmann requested toll information on the telephone number. The toll information for the telephone number revealed a list of calls that were made to and from the number in the previous two month period. Calls were made to and from Hurst, Turco, Alamiri, Rose, Zimbelman, Crosby, and Cuevas.

Investigator Hanselmann interviewed Crosby, and Crosby was then used as an informant to attempt to make undercover drug purchases. As part of the investigation,

Investigator Hanselmann located Alyass's vehicle and obtained a court order, allowing law enforcement to place a GPS tracker device on the vehicle. Investigator Hanselmann indicated the vehicle traveled to the residences of Rose, Zimbelman, Cuevas, and Eynon. Investigator Hanselmann interviewed Cuevas, and then recorded a conversation between Cuevas and Alyass.

In October 2007, Alyass contacted Sergeant Cobb, asking to meet with him. Alyass provided Sergeant Cobb with a list of individuals who were involved in methamphetamine sales, including Turco, Rose, Cuevas, and others. Sergeant Cobb testified Alyass denied involvement in the methamphetamine distribution other than to refer people to a drug source.

In November 2007, Alyass contacted Investigator Hanselmann, and the two met in Lincoln. Alyass talked about people selling and using drugs in York County, Nebraska, and identified individuals in photographs who were involved in methamphetamine sales in York, including Rose, Cuevas, Turco, Eynon, Zimbelman, Alamiri, Hurst, Crosby, and others. Investigator Hanselmann stated Alyass also discussed the amount of money the individuals paid for the drugs and from whom they purchased the drugs. Investigator Hanselmann asked Alyass "if it would surprise [Alyass] . . . people [were] telling [Investigator Hanselmann] that they get their drugs from [Alyass]." Investigator Hanselmann reported Alyass said, "people can say what they want." Alyass agreed to continue cooperating with law enforcement, but no further meetings were set up.

At the close of the government's case, Alyass moved to have the case dismissed for lack of evidence. The district court denied the motion. On October 1, 2008, the jury found Alyass guilty of the crime charged in the indictment.

## II.    DISCUSSION

Alyass appeals his conviction, arguing the evidence was insufficient to support the jury's verdict. Alyass contends evidence of Alyass's "mere presence during a drug transaction" was insufficient to prove Alyass was a member of a conspiracy to distribute and possess methamphetamine. Alyass also argues, "The only evidence offered [at trial] connecting [Alyass] to the drug dealing was the testimony of the other co-conspirators who had the benefit of either a reduced sentence or of not being prosecuted."

We review "'the sufficiency of the evidence supporting a conviction de novo, viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict.'" United States v. Farrell, 563 F.3d 364, 366 (8th Cir. 2009) (quoting United States v. Phythian, 529 F.3d 807, 811 (8th Cir. 2008)). Using this standard, '[w]e will reverse the conviction only where no reasonable jury could have found the accused guilty of the crime charged in the indictment." United States v. Whirlwind Soldier, 499 F.3d 862, 869 (8th Cir. 2007) (citing United States v. Sanders, 341 F.3d 809, 815 (8th Cir. 2003)).

In order to establish a conspiracy in this case, the government had to prove: "(1) the existence of an agreement among two or more people to achieve an illegal purpose, (2) [Alyass's] knowledge of the agreement, and (3) that [Alyass] knowingly joined and participated in the agreement." Id. (citing United States v. Johnson, 439 F.3d 947, 954 (8th Cir. 2006)). We have held, "[t]he agreement may be in the form of a tacit understanding rather than a formal, explicit agreement." Id. (citation omitted). "'[A] defendant may be convicted for even a minor role in a conspiracy, so long as the government proves beyond a reasonable doubt that he or she was a member of the conspiracy.'" Id. (quoting United States v. Lopez, 443 F.3d 1026, 1030 (8th Cir. 2006) (en banc)). While evidence of acquaintance or association is

relevant, this factor alone is insufficient to establish a conspiracy. Id. (citation omitted).

Having reviewed the trial transcript and viewing the evidence in the light most favorable to the government, we are satisfied sufficient evidence supports Alyass's conviction. The government presented evidence Hurst and Alamiri delivered methamphetamine to York and Columbus, and collected money on behalf of Alyass. Alamiri testified he lived with Alyass rent-free and received quantities of methamphetamine in exchange for his services. Turco reported she dispersed methamphetamine from her residence on behalf of Alyass and kept the money for him, unless Alyass gave her permission to pay bills with the money. Cuevas admitted he purchased methamphetamine from Alyass on a front. Rose, Zimbelman, Eynon, and Crosby each testified they purchased methamphetamine from Alyass at regular intervals. Contrary to Alyass's contention, the government presented evidence of Alyass's membership in the conspiracy that went far beyond Alyass's "mere presence . . . at the time that the cooperating witnesses bought drugs."

We also reject Alyass's argument that there was insufficient evidence supporting his conviction because the government's case relied upon the testimony of cooperating co-conspirators. The jury was made aware that each of the co-conspirators was testifying pursuant to either a nonprosecution agreement or a cooperating plea agreement. The district court instructed the jury that it "may give the testimony of such a [cooperating] witness such weight as you think it deserves," and "should . . . consider the testimony of such a witness with greater caution and care than that of an ordinary witness." We have previously held, "jury verdicts may be 'based solely on the testimony of conspirators and cooperating witnesses,' as it 'is within the province of the jury to make credibility assessments and resolve conflicting testimony.'" United States v. Jones, 559 F.3d 831, 835 (8th Cir. 2009) (quoting United States v. Buckley, 525 F.3d 629, 632 (8th Cir. 2008)). We will not disturb the credibility determinations of the jury.

## III. CONCLUSION

The judgment of the district court is affirmed.

_____